1  Victor L. George, State Bar No. 110504
2  Meylin P. Alfaro, State Bar No. 315177
   LAW OFFICES OF VICTOR L. GEORGE
3  22760 Hawthorne Blvd., Suite 200
   Torrance, California 90505
4  Telephone:  (310) 698-0990
   Facsimile:   (310) 698-0995
5  E-mail:        vgeorge@vgeorgelaw.com
                  malfaro@vgeorgelaw.com
6
7  Attorneys for PLAINTIFFS
8
9              **UNITED STATES DISTRICT COURT**
10        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
11

| | |
|---|---|
| 12 ANAIT STEPANYAN, KIRAKOS KESABLYAN, and KADZHIK KESABLYAN, individuals and heirs of Decedent VAHRAM KESABLYAN; and ANAIT STEPANYAN as Successor in Interest to VAHRAM KESABLYAN, <br><br> Plaintiffs, <br> v. <br><br> UNITED STATES OF AMERICA; F.B.I. AGENT HANNAH MARIE MONROE; F.B.I. AGENT BROMLEY RENAE; TWENTY UNKNOWN F.B.I. AGENTS; and DOES 1-100, inclusive, <br><br> Defendants. | No. 2:20-cv-01774 CAS (PLAx) <br> No. 2:20-cv-10868 CAS (PLAx) <br> *Consolidated* <br><br> **PLAINTIFFS' RESPONSE TO DEFENDANT UNITED STATES OF AMERICA'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW** <br><br> [Filed concurrently with: <br><br> 1.  Opposition to Motion for Summary Judgment; <br> 2.  Plaintiffs' Separate Statement; <br> 3.  Objections to Evidence; <br> 4.  [*Proposed*] Order re Objections to Evidence; <br> 5.  Decl. of Meylin P. Alfaro; <br> 6.  Decl. of Charles Stephenson.] <br><br> Date:   July 24, 2023 <br> Time:   10:00 a.m. <br> Crtrm:  8D <br> Hon. Christina A. Snyder <br><br> Current Trial Date:    September 19, 2023 |

1

Plaintiffs hereby submit their Response to Defendant United States of America's Statement of Uncontroverted Facts and Conclusions of Law in Opposition to Defendant's Motion for Summary Judgment:

## UNCONTROVERTED FACTS

### ISSUE NO. 1:

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| 1. | On January 5, 2018, the United States filed a criminal complaint against Kirakos Kesablyan in the Central District of California. *Evidence:* Monroe Decl., ¶¶ 11-12; *id.*, Exh. A (case 2:18-cr-00054-PSG, Dkt. 1). | Undisputed. |
| 2. | Per the complaint, on May 11, 2017, Kirakos violated 18 U.S.C. § 912 by falsely claiming to be a United States Marshal while demanding money from a victim during a dispute over forming a cannabis business. *Evidence:* Monroe Decl., ¶¶ 11-12; *id.*, Exh. A (case 2:18-cr-00054-PSG, Dkt. 1). | Disputed. No foundation; speculation; and hearsay. Said claim was dismissed on February 2, 2018. *Evidence:* Declaration of Meylin P. Alfaro ("Alfaro Decl.") ¶ 11; Exhibit 10 |
| 3. | The supporting affidavit from investigating FBI Special Agent | Disputed. No foundation; speculation; and hearsay. Said claim was dismissed |

2

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | Hannah Monroe detailed Kirakos Kesablyan's prior criminal convictions for grand theft, forgery, assault with a deadly weapon, disturbing the peace, and threatening a victim, witness, or informant. *Evidence:* Monroe Decl., ¶ 8; *id.*, Exh. A (case 2:18-cr-00054-PSG, Dkt. 1, at pp. 8-9). | on February 2, 2018. *Evidence:* Alfaro Decl. ¶ 11; Exhibit 10 |
| 4. | The Monroe affidavit detailed the FBI's telephonic recording of threatening demands for money that Kirakos made to his cannabis business partner, including Kirakos's claims to be a U.S. Marshal and federal agent. *Evidence:* Monroe Decl., ¶ 3; *id.*, Exh. A (case 2:18-cr-00054-PSG, Dkt. 1, at pp. 6-8). | Disputed. No foundation; speculation; and hearsay. Said claim was dismissed on February 2, 2018. *Evidence:* Alfaro Decl. ¶ 11; Exhibit 10 |
| 5. | The Monroe affidavit specified that Kirakos might be in possession of firearms, ammunition and other | Disputed. Lack of foundation; speculation; and hearsay. Said claim was dismissed on February 2, 2018. |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | dangerous weapons to lend credence to his claim of employment as a federal law enforcement officer and to his efforts to threaten the victim. *Evidence:* Monroe Decl., ¶ 13; *id.*, Exh. A (case 2:18-cr-00054-PSG, Dkt. 1, at pp 11-12). | *Evidence:* Alfaro Decl. ¶ 11; Exhibit 10 |
| 6. | The Monroe affidavit included a photograph of the front of the target residence on Horse Haven Street, Sun Valley, California. *Evidence:* Monroe Decl., ¶ 9; *id.*, Exh. A (case 2:18-cr-00054-PSG, Dkt. 1, at pp. 26). | Undisputed. |
| 7. | The Monroe affidavit provided law enforcement surveillance information which confirmed that Kirakos Kesablyan was residing at the Horse Haven Street premises with his wife. *Evidence:* Monroe Decl., ¶ 9; *id.*, Exh. A (case | Undisputed. |

PLAINTIFFS' RESPONSE TO DEFENDANT UNITED STATES OF AMERICA'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | 2:18-cr-00054-PSG, Dkt. 1, at pp. 26). | |
| 8. | On January 5, 2018, Magistrate Judge Standish issued arrest and search warrants for Kirakos Kesablyan at his residence located on Horse Haven Street. *Evidence:* Monroe Decl., ¶ 14; *id.*, Exh. A (case 2:18-cr-00054-PSG, Dkt. 1, at pp. 26). | Undisputed. |
| 9. | On December 26, 2017, Kirakos arrived at the Los Angeles International Airport, flying in from Doha International Airport in Qatar. *Evidence:* Monroe Decl., ¶ 5; Harris Decl., Exh. F (at FBI 2103). | Undisputed. |
| 10. | HSI conducted a border search of Kirakos' cell phone. *Evidence:* Monroe Decl., ¶ 7; Harris Decl., Exh. F (at FBI 2103). | Undisputed. |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| 11. | On November 28, 2017, the Investigative Committee of Armenia issued a warrant for the arrest of Kirakos Kesablyan based on his alleged involvement in narcotics trafficking activity, including directing the smuggling of over a kilogram of hashish oil into Armenia. *Evidence:* Monroe Decl., ¶ 6; Harris Decl., Exh. G (at FBI 560-63). | Disputed. Lack of Foundation; Hearsay; Speculation; and Mistakes Evidence. The purported Exhibit G of Harris's declaration alleges that Kirakos had in his possession of hashish oil, not a kilogram. Defendants misinterpreted the amount whereby Europeans use a coma instead of a period when indicating grams and thousands of a gram. *Evidence:* William Harris Decl. ("Harris Decl."), Exh. G (at FBI 560-63). |
| 12. | Kirakos drove across the border from Armenia into Georgia, before flying home from Qatar to Los Angeles on December 26, 2017. *Evidence:* Monroe Decl., ¶ 7; Harris Decl., Exh. F (at FBI 2103). | Disputed. Lack of Foundation; Hearsay; Speculation. *Evidence:* Hannah Monroe Decl. ("Monroe Decl."), ¶ 6; Harris Decl., Exh. G |
| 13. | By reviewing a cell phone seized from Kirakos Kesablyan by the January 8, 2018 search warrant operation, the FBI determined that | Disputed. Disputed. Lack of Foundation; Hearsay; Speculation. *Evidence:* Monroe Decl., ¶ 6; Harris Decl., Exh. |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | after Kirakos returned to Los Angeles an internet query was made on this cell phone for the name of the HSI Special Agent who had conducted a border search on Kirakos' cell phone on December 26, 2017. _Evidence:_ Monroe Decl., ¶ 18; Harris Decl., Exh. F (at FBI 2103). | G |
| 14. | Law enforcement surveillance of the Horse Haven Street residence in January of 2018 confirmed that an individual matching Kirakos Kesablyan's description was residing at the address. _Evidence:_ Monroe Decl., ¶ 9; Harris Decl., Exh. H (at FBI 2182) | Undisputed. |
| 15. | The FBI decided to use SWAT to serve the arrest and search warrants for Kirakos Kesablyan given: (1) his criminal history; (2) the nature of the crime for which he was being | Disputed. Foundation; hearsay; Speculation; prejudicial conduct towards Armenians in the Burbank, Glendale, and Sun Valley areas of Los Angeles. |

PLAINTIFFS' RESPONSE TO DEFENDANT UNITED STATES OF AMERICA'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | arrested; (3) his links to organized crime and drug trafficking; (4) his status as a person of interest in two recent homicides; and (5) his fortified residence, which possessed multiple surveillance and tactical challenges. *Evidence:* Grandy Decl., ¶ 11; Monroe Decl., ¶ 16. | *Evidence:* Monroe Decl., ¶ 16; Patrick Grandy Decl. ("Grandy Decl.") ¶ 11 |
| 16. | The FBI believed that any of those factors would have warranted the use of SWAT for the warrant operation. *Evidence:* Grandy Decl. ¶ 11. | Disputed. Foundation; hearsay; Speculation; prejudicial conduct towards Armenians in the Burbank, Glendale, and Sun Valley areas of Los Angeles. *Evidence:* Grandy Decl. ¶ 11 |
| 17. | The FBI's decision to use SWAT for the warrant operation and the SWAT Operational Plan were approved by the SWAT coordinator, the Special Agent in Charge of SWAT operations, the Assistant Special Agent in Charge of SWAT | Undisputed. |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | operations, and the Senior SWAT Team Leader. *Evidence:* Grandy Decl., ¶ 8; Monroe Decl., ¶ 16. | |
| 18. | The SWAT Operational Plan called for the FBI's SWAT team to serve the warrants at 6:00 a.m. in the morning, which is daytime service. *Evidence:* Monroe Decl., ¶ 17; Grandy Decl., ¶ 12; *id*., Exh. C (at FBI 242) | Undisputed. |
| 19. | Early on the morning of January 8, 2018, members of the FBI's Los Angeles Field Office SWAT Team assembled at a Tactical Operations Center (TOC) location near Kirakos' residence. *Evidence:* Monroe Decl., ¶ 17; Grandy Decl., ¶ 13; *Id.*, Exh. C (at FBI 242). | Undisputed. |
| 20. | At approximately 3:00 a.m., two SWAT Sniper/Observer teams received operational briefing at the | Undisputed. |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | TOC and at approximately 3:30 a.m. deployed to positions behind the residence.<br><br>*Evidence:*<br>Grandy Decl., ¶ 9; Harris Decl., Exh. J (at FBI 20); *id.*, Exh. I (at FBI 5) | |
| 21. | The FBI primarily used these Sniper/Observer teams for the purpose of establishing and maintaining surveillance on the residence.<br><br>*Evidence:*<br>Grandy Decl., ¶ 9. | Undisputed. |
| 22. | Forward looking infrared (FLIR) video surveillance of the residence was established from an overhead aircraft, and a FLIR video downlink was provided to the TOC.<br><br>*Evidence:*<br>Grandy Decl., ¶ 14; Harris Decl., Exh. J (at FBI 20); *id.*, Exh. K (FLIR video) | Undisputed. |
| 23. | At approximately 4:30 a.m. on January 8, 2018, the main team of | Undisputed. |

10

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | SWAT operators assembled at the TOC along with members of the medical team and fire department. *Evidence:* Grandy Decl., ¶ 15; Harris Decl., Exh. I (at FBI 5). | |
| 24. | A SWAT operational briefing was given at the TOC that explained the "Situation, Mission, Execution, Administration, and Communication" related to the service of both warrants. *Evidence:* Grandy Decl., ¶ 17; Harris Decl., Exh. I (at FBI 5); Monroe Decl., ¶ 17. | Undisputed. |
| 25. | The SWAT operational briefing included: (1) photos of Kirakos and the residence; (2) Kirakos' criminal history and identifiers; (3) a medical plan; (4) contingency plans; (5) list of participated law enforcement personnel; (6) list of participating Evidence Response Team personnel; | Undisputed. |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | (7) list of Interviewers; (8) List of Command Staff; (9) the establishment of a Tactical Operations Center; and (10) the DOJ Deadly Force Policy. <br> *Evidence:* <br> Grandy Decl., ¶ 17; Harris Decl., Exh. I (at FBI 5). | |
| 26. | The DOJ's Deadly Force Policy was read out loud verbatim at the SWAT operational briefing and was also projected on a screen for all present to read. <br> *Evidence:* <br> Grandy Decl., ¶ 17; Harris Decl., Exh. I (at FBI 5). | Undisputed. |
| 27. | Upon completion of the briefing, each SWAT Team Leader provided specific tasks for each SWAT operator. <br> *Evidence:* <br> Grandy Decl., ¶ 18; Harris Decl., Exh. I (at FBI 5). | Undisputed. |

PLAINTIFFS' RESPONSE TO DEFENDANT UNITED STATES OF AMERICA'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| 28. | At around 5:18 a.m., the FBI's aerial video feed and the FBI Sniper/Observer teams noted the arrival of a truck that drove down the street and parked in front of the house. *Evidence:* Harris Decl., Exh. K (FLIR video); *id.*, Exh. I (at FBI 5); Grandy Decl., ¶ 21. | Undisputed. |
| 29. | After initially stopping in front of the house's central driveway, the truck backed up until parking across the driveway on the far right side of the house, blocking that driveway while the truck's front windshield pointed down the entire front of the residence on the street. *Evidence:* Harris Decl., Exh. K (FLIR video); *id.*, Exh. I (at FBI 5); Grandy Decl., ¶ 21. | Undisputed. |
| 30. | At 5:19 a.m., the FLIR video showed an individual exiting the truck, | Disputed as to the term "guard dogs." Lack of foundation; speculation; |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | opening the residence's gate, entering the property and walking through the yard before looking over the land near two guard dogs. *Evidence:* Harris Decl., Exh. K (FLIR video); *id.*, Exh. I (at FBI 5); Grandy Decl., ¶ 21. | hearsay. *Evidence:* Deposition of Kirakos Kesablyan 17:10-19; (Exhibit 6) |
| 31. | Kirakos had two K9 German Shepherd dogs in the backyard of his residence. *Evidence:* Beck Decl., Exh. 1 (Kirakos Kesablyan dep. tr. at 17:2-19). | Undisputed. |
| 32. | The individual then walked back through the yard, crossed over to the other side of the house, and looked around that other side yard, before returning to enter the truck at 5:22 a.m. *Evidence:* Harris Decl., Exh. K (FLIR video); *id.*, Exh. I (at FBI 5); Grandy Decl., ¶ 21. | Undisputed. |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| 33. | At 5:26 a.m., the individual exited the truck again and walked down the street alongside the property to its end. _Evidence:_ Harris Decl., Exh. K (FLIR video); _id._, Exh. I (at FBI 5); Grandy Decl., ¶ 21. | Undisputed. |
| 34. | The individual then looked around the street, before returning to the truck at 5:28 a.m. _Evidence:_ Harris Decl., Exh. K (FLIR video); _id._, Exh. I (at FBI 5); Grandy Decl., ¶ 21. | Disputed as to the term "looked around the street." No foundation; Speculation; Hearsay. |
| 35. | SWAT leadership at the TOC developed and agreed upon a contingency plan for three operators, led by a SWAT team leader, to address this vehicle and detain its occupant if it still remained in place when the operation began at 6:00 a.m. | Undisputed. |

PLAINTIFFS' RESPONSE TO DEFENDANT UNITED STATES OF AMERICA'S STATEMENT OF
UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | *Evidence:* Grandy Decl., ¶ 22; Harris Decl., Exh. I (at FBI 5-6); *id.*, Exh. J (at FBI 20). | |
| 36. | Assistant Special Agent in Charge (ASAC) Patrick Grandy oversees the operations of the FBI Los Angeles Division's SWAT team, and he was the designated On Scene Commander for the warrant operation on January 8, 2018. *Evidence:* Grandy Decl., ¶¶ 1, 22. | Undisputed. |
| 37. | The SWAT team was pulled together by the Team Leader to re-brief the new plan including the vehicle team and its mission. *Evidence:* Operator 3 Decl., Exh. D (at FBI 34). | Undisputed. |
| 38. | ASAC Grandy was briefed on and concurred with the contingency plan to address the vehicle and detain its occupant if it remained in place at | Undisputed. |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | 6:00 a.m., when the main SWAT team would execute the warrants. *Evidence:* Grandy Decl., ¶ 22. | |
| 39. | ASAC Grandy believed the contingency plan was appropriate and entirely within the scope of the FBI Los Angeles Division's discretion to deploy SWAT. *Evidence:* Grandy Decl., ¶ 23. | Disputed as to "within the scope of the FBI Los Angeles Division's discretion to deploy SWAT." At no time did the division take into consideration the safety of the innocent bystander, decedent Vahram Kesablyan. *Evidence:* Plaintiff Additional Uncontroverted Fact ("PAUF") No. 5; Declaration of Charles P. Stephenson ("Stephenson Decl.") ¶ 6; Exhibits 2-5 to Alfaro Decl.; Deposition of Kirakos Kesablyan 25:7-26:4 (Exhibit 6); Deposition of Patrick Grandy 130:22-131:25 (Exhibit 7). |
| 40. | SWAT leadership in the TOC did not attempt to identify the occupant of the vehicle of the truck prior to the approach because they believed that identity was not material to the | Disputed as to "safe and effective execution of the operation" and "potentially performing a security function there." At no time did the division take into consideration the |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | safe and effective execution of the operation. Whoever the occupant was, they appeared to be associated with the subject location and potentially performing a security function there, so the vehicle had to be addressed and secured for the operation to proceed.<br>*Evidence:*<br>Grandy Decl., ¶ 24. | safety of the innocent bystander, decedent Vahram Kesablyan.<br>*Evidence:*<br>PAUF No. 5; Decl. of Charles P. Stephenson ¶ 6; Exhibits 2-5 to Alfaro Decl.; Deposition of Kirakos Kesablyan 25:7-26:4 (Exhibit 6); Deposition of Patrick Grandy 130:22-131:25 (Exhibit 7). |
| 41. | Operator 1, Operator 2, and Operator 3 (the acting SWAT team leader) were the SWAT operators tasked with clearing the vehicle and detaining its occupant.<br>*Evidence:*<br>Harris Decl., Exh. I (at FBI 5-6); *id.*, Exh. J (at FBI 20). | Undisputed. |
| 42. | As part of the FBI's investigation of the shooting, Operators 1, 2, and 3 provided signed sworn statements dated January 11, 2018 regarding what they had observed on January 8, 2018. | Undisputed. |

18

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | *Evidence:* Operator 1 Decl., Exh. E; Operator 3 Decl.., Exh. D; Harris Decl., Exh. L (Operator statements). | |
| 43. | Operator 3, an acting SWAT team leader, was asked to assemble a team to address the truck and detain its occupant.<br><br>*Evidence:*<br>Operator 1 Decl., Exh. E (at FBI 25) | Disputed. Operator# 3 was designated Team Leader to develop a plan to "Assault" the pickup. Operator #1 was designated to cover the assault actions of Operators# 2 and #3. Operators #3 and #2 would approach the pickup from the driver's side. Operator #2 was equipped with a breaching tool to facilitate making a "dynamic entry" into pickup by breaking the driver's side window on the command of Operator #3 of" Hit it".<br>*Evidence:*<br>Stephenson Decl. ¶¶ 5-6 |
| 44. | The three-person team discussed their plan on how to deal with occupants in the vehicle and detain them and them over to other law enforcement personnel on the scene. | Disputed. There was no detailed discussion between the assault team members· re "detaining" the occupant of the pickup and/or to handing the occupant over to other law enforcement officers on scene. There was a |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | *Evidence:*<br>Operator 1 Decl., Exh. E (at FBI 25) | discussion that if the pickup fled when being approached by the "assault" team that a marked LAPD would be on standby to chase and apprehend the pickup and driver.<br>*Evidence:*<br>Stephenson Decl. ¶¶ 5-6 |
| 45. | Operator 1 was directed to position himself near the front driver side area of the truck to cover the occupant.<br>*Evidence:*<br>Operator 1 Decl., Exh. E (at FBI 25) | Undisputed. |
| 46. | Operator 2 was tasked to breach the truck's windows if Operator 3 commanded it.<br>*Evidence:*<br>Operator 1 Decl., Exh. E (at FBI 25); Operator 3 Decl., Exh. D (at FBI 34). | Undisputed. |
| 47. | Operator 3, as the acting SWAT team leader, was responsible for the knock and announce at the truck.<br>*Evidence:*<br>Operator 3 Decl., Exh. D (at FBI 34). | Undisputed. |

PLAINTIFFS' RESPONSE TO DEFENDANT UNITED STATES OF AMERICA'S STATEMENT OF
UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| 48. | The three operators were equipped with standard FBI SWAT gear and wore standard FBI SWAT uniforms.<br><br>*Evidence:*<br>Operator 1 Decl., Exh. E (at FBI 26); Operator 3 Decl., Exh. D (at FBI 29); Harris Decl., Exh. L (at FBI 42). | Disputed. The Operators were wearing dark colored fatigue type SWAT clothing and protective head gear inclusive of helmets and face shields. The letters "FBI" were minimally visible on the fatigue clothing.<br>*Evidence:*<br>Stephenson Decl. ¶¶9, 11, 18 |
| 49. | At approximately 5:55 a.m. the SWAT team departed the TOC and moved towards the subject residence in SWAT vehicles.<br>*Evidence:*<br>Operator 1 Decl., Exh. E (at FBI 26). | Undisputed. |
| 50. | Upon arrival near the target location, the three-man team moved to the truck to provide cover for the main SWAT team that was approaching the front door of the residence.<br>*Evidence:*<br>Operator 1 Decl., Exh. E (at FBI 26). | Disputed. All Operators arrived and started to position themselves at their designated positions at the actual time of 06:02:48 PST, but was presented on the FLIR video clock one hour ahead of local time.<br>*Evidence:*<br>Stephenson Decl. ¶ 19 |

| | **DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE** | **PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE** |
|---|---|---|
| 51. | Operator 1 arrived at the front of the truck at 7:02:45 on the FLIR video clock, which was an hour ahead of local time.<br><br>*Evidence:*<br>Harris Decl., Exh. K (FLIR video). | Disputed. All Operators arrived and started to position themselves at their designated positions at the actual time of 06:02:48 PST, but was presented on the FLIR video clock one hour ahead of local time.<br>*Evidence:*<br>Stephenson Decl. ¶¶ 19-20 |
| 52. | Upon Operator 1's arrival at the truck, he positioned himself towards the front of the drive-side, near the wheel well, where he had the ability to see into the front of the truck cab and provide cover fire if needed.<br>*Evidence:*<br>Operator 1 Decl., Exh. E (at FBI 26). | Undisputed. |
| 53. | Operator 1 observed the silhouette of someone inside the truck as he passed the driver-side window and saw the occupant once he was at his assigned spot.<br>*Evidence:*<br>Operator 1 Decl., Exh. E (at FBI 26). | Undisputed. |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| 54. | Operator 1 turned on his rifle light to see the occupant of the truck more clearly.<br><br>*Evidence:*<br>Operator 1 Decl., Exh. E (at FBI 26). | Undisputed. |
| 55. | The truck's front windshield was transparent.<br><br>*Evidence:*<br>Harris Decl., Exh. M (at FBI 1131). | Disputed. Operator 1 was not able to see Vahram's waist area due to the hood dashboard, steering wheel and driver's side front seat configuration of the pickup.<br>*Evidence:*<br>Exhibit 8; Exhibit 11 |
| 56. | Operator 1 observed a middle-aged white male leaning back in the truck and realized he was not Kirakos Kesablyan.<br>*Evidence:*<br>Operator 1 Decl., Exh. E (at FBI 26). | Undisputed. |
| 57. | Operator 3 knocked on the driver-side door and verbally announced that they were FBI.<br><br>*Evidence:*<br>Operator 3 Decl., Exh. D (at FBI 35). | Disputed. Operator #3 began banging and pounding on driver's side window and shouting, yelling and screaming. Operators did not issue any commands to the occupant about the purpose of the assault team wanting to gain entry |

23

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | | into the pickup. *Evidence:* Stephenson Decl. ¶¶9, 11, 12, 26, 27, 40; Exhibit 2 - FBI SWAT Operator1 Statement FBI 000023-FBI 000032; Exhibit 3 - FBI SWAT Operator 2 Statement FBI 000041-FBI 000050; Exhibit 4 - FBI SWAT Operator 3 Statement FBI 000033-FBI 000040; Exhibit 5 or Defense Exhibit K - FLIR Video (FBI Forward Looking InfraRed Video of incident from 5:13:04 a.m. – 6:28:54 am on day of Incident): N198RN-2018-01-08-131322. |
| 58. | From Operator 1's perspective, the occupant appeared startled when Operator 3 knocked on the driver-side window and verbally identified the officers as FBI. *Evidence:* Operator 1 Decl., Exh. E (at FBI 26). | Disputed. Operator #1 perceived the occupant appeared startled and confused when Operator# 3 started pounding on the door. *Evidence:* Stephenson Decl. ¶¶ 11, 27. |

| | **DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE** | **PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE** |
|---|---|---|
| 59. | Operator 3 commanded the driver to put his hands up, but he did not comply.<br><br>*Evidence:*<br>Operator 3 Decl., Exh. D (at FBI 35); Harris Decl., Exh. L (at FBI 45). | Disputed. Operator #3 began banging and pounding on driver's side window and shouting, yelling and screaming. Operators did not issue any commands to the occupant about the purpose of the assault team wanting to gain entry into the pickup.<br>*Evidence:*<br>Stephenson Decl. ¶¶9, 11, 12, 26, 27, 32, 34, 40;<br>Exhibit 2 - FBI SWAT Operator1 Statement FBI 000023-FBI 000032;<br>Exhibit 3 -  FBI SWAT Operator 2 Statement FBI 000041-FBI 000050;<br>Exhibit 4 - FBI SWAT Operator 3 Statement FBI 000033-FBI 000040;<br>Exhibit 5 or Defense Exhibit K - FLIR Video (FBI Forward Looking InfraRed Video of incident from 5:13:04 a.m. – 6:28:54 am on day of Incident): N198RN-2018-01-08-131322. |
| 60. | Operator 3 tried to open the truck door but it was locked. | Undisputed. |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | *Evidence:*<br>Operator 3 Decl., Exh. D (at FBI 35). | |
| 61. | Operator 3 commanded the driver to unlock or open the door.<br><br>*Evidence:*<br>Operator 3 Decl., Exh. E (at FBI 26). | Disputed. Operator #3 began banging and pounding on driver's side window and shouting, yelling and screaming. Operators did not issue any commands to the occupant about the purpose of the assault team wanting to gain entry into the pickup. Compound.<br>*Evidence:*<br>Stephenson Decl. ¶¶9, 11, 12, 26, 27, 40;<br>Exhibit 2 - FBI SWAT Operator1 Statement FBI 000023-FBI 000032;<br>Exhibit 3 - FBI SWAT Operator 2 Statement FBI 000041-FBI 000050;<br>Exhibit 4 - FBI SWAT Operator 3 Statement FBI 000033-FBI 000040;<br>Exhibit 5 or Defense Exhibit K - FLIR Video (FBI Forward Looking InfraRed Video of incident from 5:13:04 a.m. – 6:28:54 am on day of Incident): N198RN-2018-01-08-131322. |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| 62. | From Operator 1's perspective, the driver initially appeared to comply with Operator 3's command to open the door and moved his hands to his left, towards the driver-side door, as if to open it.<br><br>*Evidence:*<br>Operator 1 Decl., Exh. E (at FBI 26). | Disputed. Speculation. Operator #3 began banging and pounding on driver's side window and shouting, yelling and screaming. Operators did not issue any commands to the occupant about the purpose of the assault team wanting to gain entry into the pickup. Compound. *Evidence:*<br>Stephenson Decl. ¶¶9, 11, 12, 26, 27, 40;<br>Exhibit 2 - FBI SWAT Operator1 Statement FBI 000023-FBI 000032;<br>Exhibit 3 - FBI SWAT Operator 2 Statement FBI 000041-FBI 000050;<br>Exhibit 4 - FBI SWAT Operator 3 Statement FBI 000033-FBI 000040;<br>Exhibit 5 or Defense Exhibit K - FLIR Video (FBI Forward Looking InfraRed Video of incident from 5:13:04 a.m. – 6:28:54 am on day of Incident): N198RN-2018-01-08-131322. |
| 63. | From Operator 1's perspective, he saw that the driver did not then | Disputed. Speculation. Operator #3 began banging and pounding on |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | unlock or open the door, but rather then moved his hands back from the door and began moving his hands towards the right side of his waist.<br><br>*Evidence:*<br>Operator 1 Decl., Exh. E (at FBI 27). | driver's side window and shouting, yelling and screaming. Operators did not issue any commands to the occupant about the purpose of the assault team wanting to gain entry into the pickup. Compound. *Evidence:*<br>Stephenson Decl. ¶¶9, 11, 12, 26, 27, 40;<br>Exhibit 2 - FBI SWAT Operator1 Statement FBI 000023-FBI 000032;<br>Exhibit 3 -  FBI SWAT Operator 2 Statement FBI 000041-FBI 000050;<br>Exhibit 4 - FBI SWAT Operator 3 Statement FBI 000033-FBI 000040;<br>Exhibit 5 or Defense Exhibit K - FLIR Video (FBI Forward Looking InfraRed Video of incident from 5:13:04 a.m. – 6:28:54 am on day of Incident): N198RN-2018-01-08-131322. |
| 64. | As the driver moved his hands away from the door, Operator 1 noticed that his demeanor changed, his eyes widened, he stiffened, and appeared | Disputed. Operators 1 and 3 were shining flashlights in Vahram's face where Vahram was illuminated and the operators were not. Operator #3 began |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | ready to fight. At this point, his hands were out of Operator 1's sight.<br><br>*Evidence:*<br>Operator 1 Decl., Exh. E (at FBI 27). | banging and pounding on driver's side window and operators 2 and 3 were shouting, yelling and screaming, with Operator 2 using foul language directed at Plaintiff. Operators did not issue any commands to the occupant about the purpose of the assault team wanting to gain entry into the pickup.<br>*Evidence:*<br>Stephenson Decl. ¶¶9, 11, 12, 26, 27, 32, 40;<br>Exhibit 2 - FBI SWAT Operator1 Statement FBI 000023-FBI 000032;<br>Exhibit 3 -  FBI SWAT Operator 2 Statement FBI 000041-FBI 000050;<br>Exhibit 4 - FBI SWAT Operator 3 Statement FBI 000033-FBI 000040;<br>Exhibit 5 or Defense Exhibit K - FLIR Video (FBI Forward Looking InfraRed Video of incident from 5:13:04 a.m. – 6:28:54 am on day of Incident): N198RN-2018-01-08-131322. |
| 65. | Operator 2 noticed that the occupant was moving about in the seat and | Disputed. Operators 1 and 3 were shining flashlights in Vahram's face |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | displayed a very aggressive look while continuing to keep his hands near his belly button area.<br><br>*Evidence:* NO EVIDENCE IN DEFT'S SEP STMT | where Vahram was illuminated and the operators were not. Operator #3 began banging and pounding on driver's side window and operators 2 and 3 were shouting, yelling and screaming, with Operator 2 using foul language directed at Plaintiff. Operators did not issue any commands to the occupant about the purpose of the assault team wanting to gain entry into the pickup.<br>*Evidence:*<br>Stephenson Decl. ¶¶9, 11, 12, 26, 27, 32, 40;<br>Exhibit 2 - FBI SWAT Operator1 Statement FBI 000023-FBI 000032;<br>Exhibit 3 - FBI SWAT Operator 2 Statement FBI 000041-FBI 000050;<br>Exhibit 4 - FBI SWAT Operator 3 Statement FBI 000033-FBI 000040;<br>Exhibit 5 or Defense Exhibit K - FLIR Video (FBI Forward Looking InfraRed Video of incident from 5:13:04 a.m. – 6:28:54 am on day of Incident): N198RN-2018-01-08-131322. |

PLAINTIFFS' RESPONSE TO DEFENDANT UNITED STATES OF AMERICA'S STATEMENT OF
UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|---|
| 66. | | The operators commanded the driver to show his hands, but he did not comply.<br><br>*Evidence:*<br>Operator 1 Decl., Exh. E (at FBI 27); Operator 3 Decl., Exh. D (at FBI 35). | Disputed. Operators 1 and 3 were shining flashlights in Vahram's face where Vahram was illuminated and the operators were not. Operator #3 began banging and pounding on driver's side window and operators 2 and 3 were shouting, yelling and screaming, with Operator 2 using foul language directed at Plaintiff. Operators did not issue any commands to the occupant about the purpose of the assault team wanting to gain entry into the pickup.<br>*Evidence:*<br>Stephenson Decl. ¶¶9, 11, 12, 26, 27, 32, 40;<br>Exhibit 2 - FBI SWAT Operator1 Statement FBI 000023-FBI 000032;<br>Exhibit 3 - FBI SWAT Operator 2 Statement FBI 000041-FBI 000050;<br>Exhibit 4 - FBI SWAT Operator 3 Statement FBI 000033-FBI 000040;<br>Exhibit 5 or Defense Exhibit K - FLIR Video (FBI Forward Looking InfraRed Video of incident from 5:13:04 a.m. – |

|  | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
|  |  | 6:28:54 am on day of Incident): N198RN-2018-01-08-131322. |
| 67. | The operators escalated their voices in urgency to command the driver to show his hands.<br><br>*Evidence:*<br>Operator 3 Decl., Exh. D (at FBI 36); Harris Decl., Exh. L (at FBI 45). | Disputed. Operators 1 and 3 were shining flashlights in Vahram's face where Vahram was illuminated and the operators were not. Operator #3 began banging and pounding on driver's side window and operators 2 and 3 were shouting, yelling and screaming, with Operator 2 using foul language directed at Plaintiff. Operators did not issue any commands to the occupant about the purpose of the assault team wanting to gain entry into the pickup.<br>*Evidence:*<br>Stephenson Decl. ¶¶9, 11, 12, 26, 27, 32, 40;<br>Exhibit 2 - FBI SWAT Operator1 Statement FBI 000023-FBI 000032;<br>Exhibit 3 - FBI SWAT Operator 2 Statement FBI 000041-FBI 000050;<br>Exhibit 4 - FBI SWAT Operator 3 Statement FBI 000033-FBI 000040;<br>Exhibit 5 or Defense Exhibit K - FLIR |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | | Video (FBI Forward Looking InfraRed Video of incident from 5:13:04 a.m. – 6:28:54 am on day of Incident): N198RN-2018-01-08-131322. |
| 68. | Because he could not see the driver's hands and could not see clearly into the truck, Operator 3 instructed Operator 2 to breach the driver-side window.<br><br>*Evidence:*<br>Operator 3 Decl., Exh. D (at FBI 35-36). | Disputed. At 06:02:57 or 9 seconds after the Operators arrived and were in their assigned positions Operator #3 could not see the occupants' hands clearly through the tinted driver's side window and gave the command of "Hit it" to Operator #3 to execute a dynamic entry into the pickup by forcibly shattering the driver's side window with the breaching tool.<br>*Evidence:*<br>Stephenson Decl. ¶¶ 13, 33; Exhibit 2 - FBI SWAT Operator1 Statement FBI 000023-FBI 000032; Exhibit 3 - FBI SWAT Operator 2 Statement FBI 000041-FBI 000050; Exhibit 4 - FBI SWAT Operator 3 Statement FBI 000033-FBI 000040; Exhibit 5 or Defense Exhibit K - FLIR Video (FBI Forward Looking InfraRed Video of |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | | incident from 5:13:04 a.m. – 6:28:54 am on day of Incident): N198RN-2018-01-08-131322. |
| 69. | As he began to swing the halligan tool towards the window, Operator 2 saw the occupant move his hands towards his waistband while he raised his pelvis. *Evidence:* Harris Decl., Exh. L (at FBI 45). | Disputed. As Operator #2 swung the breaching tool, he claims he saw the occupant move his hands toward his waist. *Evidence:* Stephenson Decl. ¶¶ 33, 34 |
| 70. | Operator 2 breached the window with a halligan tool, as seen on the FLIR video at 7:02:57, which was 6:02:57 a.m. local time. *Evidence:* Harris Decl., Exh. K (FLIR video); Operator 3 Decl., Exh. D (at FBI 36). | Undisputed. |
| 71. | Because he observed the occupant's hands were reaching towards his waistband, Operator 2 yelled "waistband, waistband, waistband." *Evidence:* Operator 3 Decl., Exh. D (at FBI 35); Harris Decl., Exh. L (at FBI 46). | Disputed. Operator #2 claims he saw Vahram's hands moving towards his waistband and yelled "waistband" three times. Operators# 3 also began to shout waistband. *Evidence:* Stephenson Decl. ¶¶ 34-35. |

PLAINTIFFS' RESPONSE TO DEFENDANT UNITED STATES OF AMERICA'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| 72. | Operator 3 heard more warnings and commands about the waistband from the other operators. *Evidence:* Operator 3 Decl., Exh. D (at FBI 36) | Undisputed. |
| 73. | The operators continued giving commands for the truck's occupant to raise his hands, but he continued not to comply. *Evidence:* Operator 1 Decl., Exh. E (at FBI 27). | Disputed. Operators 1 and 3 were shining flashlights in Vahram's face where Vahram was illuminated and the operators were not. Operator #3 began banging and pounding on driver's side window and operators 2 and 3 were shouting, yelling and screaming, with Operator 2 using foul language directed at Plaintiff. Operators did not issue any commands to the occupant about the purpose of the assault team wanting to gain entry into the pickup. *Evidence:* Stephenson Decl. ¶¶9, 11, 12, 26, 27, 32, 40; Exhibit 2 - FBI SWAT Operator1 Statement FBI 000023-FBI 000032; Exhibit 3 - FBI SWAT Operator 2 Statement FBI 000041-FBI 000050; |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | | Exhibit 4 - FBI SWAT Operator 3 Statement FBI 000033-FBI 000040; Exhibit 5 or Defense Exhibit K - FLIR Video (FBI Forward Looking InfraRed Video of incident from 5:13:04 a.m. – 6:28:54 am on day of Incident): N198RN-2018-01-08-131322. |
| 74. | Operator 1 observed the driver grab his shirt near the right side of his waistband, lift his shirt with his left hand, and reach into his waistband with his right hand. _Evidence:_ Operator 1 Decl., Exh. E (at FBI 27) | Disputed. Speculation.  Operator 1 was not able to see Vahram's waist area due to the hood dashboard, steering wheel and driver's side front seat configuration of the pickup. _Evidence:_ Exhibit 8; Exhibit 11 |
| 75. | Operator 1 observed the driver struggling to pull what Operator 1 believed to be a gun from his waistband. _Evidence:_ Operator 1 Decl., Exh. E (at FBI 27) | Disputed. Speculation. Operator 1 was not able to see Vahram's waist area due to the hood dashboard, steering wheel and driver's side front seat configuration of the pickup. _Evidence:_ Exhibit 8; Exhibit 11 |
| 76. | Based on Operator 1's observation of the driver's movements and his experience with handling concealed | Disputed. Speculation. Operator 1 was not able to see Vahram's waist area due to the hood dashboard, steering wheel |

PLAINTIFFS' RESPONSE TO DEFENDANT UNITED STATES OF AMERICA'S STATEMENT OF
UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | weapons, Operator 1 believed that the driver was trying to pull a gun from his waistband and feared that he and the other operators were about to be shot. *Evidence:* Operator 1 Decl., Exh. E (at FBI 27) | and driver's side front seat configuration of the pickup. *Evidence:* Exhibit 8; Exhibit 11 |
| 77. | In response to what he believed to be the threat of imminent bodily harm, Operator 1 fired his rifle at the vehicle's driver. *Evidence:* Operator 1 Decl., Exh. E (at FBI 27) | Disputed. No foundation. Speculation. Operator 1 was not able to see Vahram's waist area due to the hood dashboard, steering wheel and driver's side front seat configuration of the pickup. *Evidence:* Exhibit 8; Exhibit 11 |
| 78. | Operator 1 began firing at 7:03:01 on the FLIR video clock. *Evidence:* Harris Decl., Exh. K (FLIR video). | Disputed. At 6:03:01 or 13 seconds after arriving at his assigned position Operator # 1 fired his rifle five times at Vahram, killing him. *Evidence:* Stephenson Decl. ¶ 5, 6; Exhibit 2 - FBI SWAT Operator1 Statement FBI 000023-FBI 000032; Exhibit 3 - FBI SWAT Operator 2 Statement FBI |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | | 000041-FBI 000050; Exhibit 4 - FBI SWAT Operator 3 Statement FBI 000033-FBI 000040; Exhibit 5 or Defense Exhibit K - FLIR Video (FBI Forward Looking InfraRed Video of incident from 5:13:04 a.m. – 6:28:54 am on day of Incident): N198RN-2018-01-08-131322. |
| 79. | Operator 1 fired his rifle to address the threat, stopping after five shots, when the occupant's arms stopped moving and Operator 1 believed he no longer posed a lethal threat. *Evidence:* Operator 1 Decl., Exh. E (at FBI 27); Harris Decl., Exh. K (FLIR video). | Disputed. There was no threat from Vahram. *Evidence:* Stephenson Decl. ¶ 5, 6, 7, 8, 9 |
| 80. | Operator 1 ceased firing at 7:03:02 on the FLIR video clock. *Evidence:* Harris Decl., Exh. K (FLIR video). | Undisputed. |
| 81. | Operator 3 announced "shots fired" over the radio. *Evidence:* Operator 3 Decl., Exh. D (at FBI 36) | Undisputed. |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| 82. | Operator 2 pulled Vahram out of the truck and began to provide him immediate medical treatment. *Evidence:* Operator 1 Decl., Exh. E (at FBI 27); Operator 3 Decl., Exh. D (at FBI 36) | Undisputed. |
| 83. | As Vahram was pulled out from the vehicle, Operator 1 observed an empty tan-colored gun holster in his right-front waistband. *Evidence:* Operator 1 Decl., Exh. E (at FBI 27) | Undisputed. |
| 84. | As Operator 2 pulled Vahram from the vehicle, he observed that Vahram had an empty gun holster inside his waistband. *Evidence:* Operator 3 Decl., Exh. D (at FBI 46) | Undisputed. |
| 85. | As Vahram was pulled out from the vehicle, Operator 3 observed a pistol fall to the floor board on the driver side of the truck, and announced "gun" verbally. | Undisputed. |

PLAINTIFFS' RESPONSE TO DEFENDANT UNITED STATES OF AMERICA'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | *Evidence:*<br>Operator 3 Decl., Exh. D (at FBI 36) | |
| 86. | Operator 2 looked inside the truck and saw a revolver on the driver's side floor area.<br>*Evidence:*<br>Harris Decl., Exh. L (at FBI 46) | Undisputed. |
| 87. | Operator 2 provided medical attention to the vehicle's occupant, including chest seals and a Nasopharyngeal Airway.<br>*Evidence:*<br>Harris Decl., Exh. L (at FBI 47) | Undisputed. |
| 88. | Operator 3 radioed and called for the on-scene medics, who quickly approached and applied a chest decompression needle.<br>*Evidence:*<br>Operator 3 Decl., Exh. D (at FBI 36-37); Harris Decl., Exh. L (at FBI 47) | Undisputed. |
| 89. | Vahram was taken to the on-scene ambulance, which took him away to the local hospital, where he was pronounced dead. | Undisputed. |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | *Evidence:*<br>Harris Decl., Exh. L (at FBI 47); *id.*, Exh. I (at FBI 4) | |
| 90. | The coroner ascribed Vahram's death to "multiple gunshot wounds."<br>*Evidence:*<br>Harris Decl., Exh. N (at FBI 175). | Undisputed. |
| 91. | After he was arrested on January 8, 2018, Plaintiff Kirakos Kesablyan told FBI SWAT Operator 3 "If my dad dies you're all fucking dead."<br>*Evidence:*<br>Harris Decl., Exh. O (at FBI 551-52). | Disputed. No foundation; Hearsay; Misstates Evidence. |
| 92. | None of the three Plaintiffs saw the shooting when it occurred on January 8, 2018 in front of the Sun Valley residence.<br>*Evidence:*<br>Beck Decl., Exh. 1 (Kirakos Kesablyan dep. tr. at 27:20-28:10); *id.*, Exh. 2 (Kadzhik Kesablyan dep. tr. at 15:18-16:25); *id.*, Exh. 3 (Anait Stepanyan dep. tr. at 26:8-16). | Undisputed. |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| 93. | Kirakos Kesablyan was arrested by the FBI on January 8, 2018.<br>*Evidence:*<br>Harris Decl., Exh. J (at FBI 21) | Undisputed. |
| 94. | In February of 2018, Kirakos Kesablyan was indicted for being a felon in possession of firearms and ammunition in violation of 18 U.S.C. § 922(g)(1).<br>*Evidence:*<br>Indictment, *United States v. Kirakos Kesablyan, et al.*, 2:18-cr-00054-PSG. [Dkt. no. 20]. | Undisputed. |
| 95. | The plea agreement filed on August 30, 2018 in Kirakos Kesablyan's criminal case stated as follows:<br>On or about January 8, 2018, in the County of Los Angeles, within the Central District of California, defendant knowingly possessed the following firearms and ammunition: (1) a Mossberg model 500, 12-gauge shotgun, bearing serial number V0516405; (2) a Glock model 27, | Disputed. Kirakos pled no contest. Plea Agreement, *United States v. Kirakos Kesablyan, et al.*, 2:18-cr-00054-PSG. [Dkt. no. 60 at p. 6]. |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | .40 caliber pistol, bearing serial number XEK303; (3) approximately 24 rounds of Winchester 12-guage ammunition; (4) approximately 8 rounds of Poongsan .40 caliber ammunition; and (5) approximately 8 rounds of Federal .40 caliber ammunition. *Evidence:* Plea Agreement, *United States v. Kirakos Kesablyan, et al.*, 2:18-cr-00054-PSG. [Dkt. no. 60 at p. 6]. | |
| 96. | Kirakos Kesablyan was found guilty of being a felon in possession of firearms and ammunition in violation of 18 U.S.C. § 922(g)(1) and was sentenced to five years of Probation and a fine of $13,000. *Evidence:* Judgment and Commitment, *United States v. Kirakos Kesablyan, et al.*, 2:18-cr-00054-PSG. [Dkt. no. 79]. | Disputed. Kirakos pled no contest. Plea Agreement, *United States v. Kirakos Kesablyan, et al.*, 2:18-cr-00054-PSG. [Dkt. no. 60 at p. 6]. |
| 97. | On January 8, 2018, Kirakos Kesablyan was interviewed after his | Undisputed. |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | arrest by FBI Special Agent Hannah Monroe and by LAPD officers.<br><br>*Evidence:*<br>Harris Decl., Exh. Q (at FBI 145). | |
| 98. | When he was interviewed on January 8, 2018, Kirakos stated that a member of his homeowner's association had called him early that morning and told him that they had observed suspicious activity, including an unknown party who had told him to leave the area.<br><br>*Evidence:*<br>Harris Decl., Exh. Q (at FBI 145). | Undisputed. |
| 99. | Kirakos claimed that he called his father to come pick up the kids for school, and that his father had come over so early that day because he could not sleep due to his cancer treatment.<br><br>*Evidence:*<br>Harris Decl., Exh. Q (at FBI 145). | Undisputed. |

PLAINTIFFS' RESPONSE TO DEFENDANT UNITED STATES OF AMERICA'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| 100. | Kirakos asserted that his father was sleeping in the truck when he was shot.<br>*Evidence:*<br>Harris Decl., Exh. Q (at FBI 145). | Undisputed. |
| 101. | Kirakos claimed he had watched the entire operation live on his cameras, and that he had watched Special Agent Hannah Monroe shoot his father.<br>*Evidence:*<br>Harris Decl., Exh. Q (at FBI 145). | Disputed. No foundation; Hearsay; Misstates Evidence. |
| 102. | Kirakos claimed that his father was a retired Fresno Deputy Sheriff.<br>*Evidence:*<br>Harris Decl., Exh. Q (at FBI 145). | Disputed. No foundation; Hearsay; Misstates Evidence. |
| 103. | Kirakos claimed that his father had a Concealed Carry Weapons (CCW) permit for his handgun.<br>*Evidence:*<br>Harris Decl., Exh. Q (at FBI 145). | Undisputed. |
| 104. | At his deposition, Kirakos testified as follows: | Undisputed. |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | Q. Do you know why it was that he arrived at 5:20 on January 8th, 2018? A. I called him. The dogs were barking abnormal; so that's why he arrived about 20 minutes early. *Evidence:* Beck Decl., Exh. 1 (Kirakos Kesablyan dep. tr. at 24:16-24). | |
| 105. | Kirakos testified as follows: Q. So going back to the morning of January 8th, 2018, your father, after arriving at the property, called you and let you know that he had fed the dogs and gave them some water; correct? A. Correct. *Evidence:* Beck Decl., Exh. 1 (Kirakos Kesablyan dep. tr. at 27:7-11). | Undisputed. |
| 106. | Kirakos testified that he did not see the shooting of Vahram, and believes he may have fallen asleep before he was woken up by hearing gunshots. | Undisputed. |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | *Evidence:*<br>Beck Decl., Exh. 1 (Kirakos Kesablyan dep. tr. at 27:22-28:10). | |
| 107. | Vahram's wife, Anait Stepanyan, testified that the children's school classes started at 7:00 a.m. in the morning.<br>*Evidence:*<br>Beck Decl., Exh. 3 (Anait Stepanyan dep. tr. at 29:15-20). | Undisputed. |
| 108. | The principal of the children's school testified that the school started at 8:10 a.m. each day, and children could not be dropped off any earlier than 7:30 a.m.<br>*Evidence:*<br>Beck Decl., Exh. 4 (Maral Tavitian dep. tr. at 9:22-10:3). | Disputed. Rose and Alex Pilibos Armenian School is located at 1615 N. Alexandria, Los Angeles, CA, which is 13.2 miles away from the 10325 Horse Haven Kirakos home. During morning traffic time, the commute can take over 30 minutes. A simple Google map search indicates it would take 25 minutes with little to no traffic to get there from the Horse Haven Kirakos home.<br>*Evidence:*<br>Alfaro Decl. ¶ 13 |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| 109. | Vahram's December 14, 2012 CCW permit application to the Fresno County Sheriff stated that Vahram needed a CCW permit because he owned the Mikes Custom Marble business located in Fresno California, and that as an owner of that business he had to carry currency on a daily basis.<br><br>*Evidence:*<br>Beck Decl., Exh. 12 (permit application). | Disputed. The reason given by applicant Vahram Kasablyan for obtaining a CCW, was a as follows:<br><br>"I am a business owner involved in the transportation and sales of construction materials 1 of ten (sic) have large cash transactions in different cities. **I also have rentals which I collect cash from**."<br>At the time of this incident Vahram Kesablyan was still running Mike's custom marble in Fresno in 2017.<br>*Evidence:*<br>Daniel Beck Decl., Exh. 12 (permit application); Deposition of Kirakos Kesablyan 52:21-53:4 (Exhibit 6); Anahit Stepanyan Depo. 72:16-18; 74:20-23 (Exhibit 16). |
| 110. | Kadzhik Kesablyan testified that his father applied to get a CCW permit because he was a businessman who had to go the bank a lot and deal | Undisputed. |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | with cash in his business Mike's Custom Marble. *Evidence:* Beck Decl., Exh. 2 (Kadzhik Kesablyan dep. tr. at 32:1-7). | |
| 111. | On April 13, 2012, Vahram Kesablyan was issued a citation by the Contractors State License Board for acting as a contractor while his license was inactive and for failing to report a Workers Compensation Insurance Policy. *Evidence:* Beck Decl., Exh. 10 (April 13, 2012 citation). | Disputed. No foundation; Hearsay. |
| 112. | On July 4, 2013, the Contractors State License Board issued a Notice of Revoked License to Mikes Custom Marble, stating that the license had been revoked on July 1, 2013 for failure to comply with Citation Number 2 2011 2183. *Evidence:* | Disputed. No foundation; Hearsay. |

| | | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|---|
| | | Beck Decl., Exh. 11 (July 1, 2013 license revocation notice). | |
| 113. | | In his December 14, 2012 CCW permit application, and in his renewal CCW permit application in 2017, Vahram Kesablyan did not disclose to the Fresno County Sheriff that his California contractor license had expired, was inactive, or was revoked. _Evidence:_ Beck Decl., Exh. 12 (December 14, 2012 permit application). | Disputed. No foundation; Hearsay. |
| 114. | | The CCW licenses that the Fresno County Sheriff issued for Vahram Kesablyan on May 30, 2017 and January 9, 2018 identified Vahram's residence address as Fresno, California, rather than Los Angeles, California. _Evidence:_ Beck Decl., Exhs. 13, 14 (May 30, 2017 and January 9, 2018 CCW licenses). | Undisputed. |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| 115. | In 2015 Vahram was treated for cancer, which went into remission by April of 2016.<br><br>*Evidence:*<br>Beck Decl., Exh. 5 (Dr. Stephen J. Forman dep. tr. at 12:24-14:8). | Undisputed. |
| 116. | On April 18, 2016, Vahram told his treating physician, Dr. Stephen Foreman, that he had retired from construction.<br><br>*Evidence:*<br>Beck Decl., Exh. 5 (Dr. Stephen J. Forman dep. tr. at 14:15-25). | Disputed. No foundation; Hearsay. |
| 117. | On July 21, 2016, Vahram told Dr. Foreman that he was not working anymore.<br><br>*Evidence:*<br>Beck Decl., Exh. 5 (Dr. Stephen J. Forman dep. tr. at 12:14-20). | Disputed. No foundation; Hearsay. |
| 118. | In February of 2017 Dr. Foreman discussed with Vahram the fact that he was not working any more. | Disputed. No foundation; Hearsay. |

| DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | *Evidence:* Beck Decl., Exh. 5 (Dr. Stephen J. Forman dep. tr. at 17:9-19:1). | |
| 119. | Plaintiff's retained expert witness Charles P. Stephenson served as a Special Agent in the FBI from 1973-1983. *Evidence:* Beck Decl., Exh. 6 (Stephenson dep. tr. at 19:17-19, 39:22-25). | Undisputed. |
| 120. | Mr. Stephenson was never a supervisory special agent, special agent in charge, or assistant special agent in charge for the FBI. *Evidence:* Beck Decl., Exh. 6 (Stephenson dep. tr. at 28:1-14). | Undisputed. |
| 121. | Mr. Stephenson has never drafted a SWAT operational plan, was never involved in the approval of a SWAT operational plan, and never delivered a SWAT operational briefing. | Undisputed. |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | *Evidence:* Beck Decl., Exh. 6 (Stephenson dep. tr. at 48:7-25). | |
| 122. | Mr. Stephenson has never been a member of an assault SWAT team. *Evidence:* Beck Decl., Exh. 6 (Stephenson dep. tr. at 49:1-11). | Disputed. Mr. Stephenson was deployed on numerous occasions as a member of the FBI Omaha SWAT team and involved in the exchanges of gunfire as a SWAT FBI Agent with subjects on numerous occasions. *Evidence:* Stephenson Decl. ¶ ¶ 3, 38 |
| 123. | Mr. Stephenson never led an FBI SWAT team. *Evidence:* Beck Decl., Exh. 6 (Stephenson dep. tr. at 37:13-17). | Undisputed. |
| 124. | Mr. Stephenson was never part of a contingent of SWAT operators that attempted to address a vehicle in connection with a SWAT operation. *Evidence:* Beck Decl., Exh. 6 (Stephenson dep. tr. at 49:12-25). | Disputed. Mr. Stephenson as an FBI SWAT Agent was an active participant in SWAT operations involving the approach and securing of vehicles being occupied by subjects being arrested in SWAT operations on numerous occasions. |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | | *Evidence:* Stephenson Decl. ¶ 39 |
| 125. | Mr. Stephenson deployed a total of three times as part of an FBI SWAT team. *Evidence:* Beck Decl., Exh. 6 (Stephenson dep. tr. at 37:6-12). | Disputed. Mr. Stephenson was deployed on numerous occasions as a member of the FBI Omaha SWAT team and involved in the exchanges of gunfire as a SWAT FBI Agent with subjects on numerous occasions. *Evidence:* Stephenson Decl. ¶¶ 3, 38. |
| 126. | Mr. Stephenson testified at his May 25, 2023 deposition that based on Operator 1's observations of the vehicle occupant, as those observations were summarized in Mr. Stephenson's written report, "I felt he was justified in using lethal force." *Evidence:* Beck Decl., Exh. 6 (Stephenson dep. tr. at 55:1-56:7). | Disputed. On May 25, 2023, Mr. Stephenson provided the following errata to his deposition in this matter at page 56, lines 4-6: "Corrections: Page 56 - delete lines 4 thru 6 replace with: When I considered the "totality of circumstances"; the movements of Mr. Kesablyan as reported by Operator #1 immediately prior firing his weapon, my answer is a qualified yes . When I consider the immediate actions of |

| | DEFENDANT'S UNCONTROVERTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE TO CITED FACT AND SUPPORTING EVIDENCE |
|---|---|---|
| | | Operators# 2 and # 3 after reaching the pickup and being told by Operator #1 the individual in the truck was not the subject; of shining a flashlight into the individuals face, attempting to open the driver's door, pounding on the driver's window, shouting at the individual to open the door and get your "fucking hands up", then shattering the driver's side window when no " exigent circumstances" existed to warrant such aggressive action it is my opinion that the actions of Operator #1, #2 and #3 that lead to the use of lethal force against Mr. Kesablyan was "objectively unreasonable". *Evidence:* Exhibit 9 |

///
///
///
///

PLAINTIFFS' RESPONSE TO DEFENDANT UNITED STATES OF AMERICA'S STATEMENT OF
UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

## PLAINTIFF'S RESPONSE TO DEFENDANT'S CONCLUSIONS OF LAW

### I.   LEGAL STANDARD

We have held that "summary judgment should be granted sparingly in excessive force cases." *Gonzalez v. City of Anaheim* (2014) 747 F.3d 789, 795 (en banc). "This principle applies with particular force where," as here, "the only witness other than the officers was killed during the encounter." Id. "In such cases, we must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify." Id. (internal quotation marks omitted). "Accordingly, we carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, ... to determine whether the officer's story is internally consistent and consistent with other known facts." Id. (internal quotation marks omitted). "We must also examine circumstantial evidence that, if believed, would tend to discredit the police officer's story." Id. (internal quotation marks omitted). *Estate of Lopez by and through Lopez v. Gelhaus* (2017) 871 F.3d 998, 1006.

### II.   SUMMARY JUDGMENT SHOULD NOT BE GRANTED CONSIDERING ALL FACTS AND VIEWING ALL INFERENCES IN FAVOR OF PLAINTIFF

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.  Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial." *Anderson v. Liberty Lobby, Inc.,* (1986) 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L.Ed. 2d 202.

Plaintiff is only required to show "that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat. Bank of Ariz. v. Cities Serv. Co.,* (1968) 391 U.S. 253, 288, 88 S. Ct. 1575, 1592, 20 L.Ed. 2d 569.

1   "The court's ultimate inquiry is to determine whether the 'specific facts' set forth

2   by the nonmoving party, coupled with undisputed background or contextual facts, are such

3   that a rational or reasonably jury might return a verdict in its favor based on that evidence."

4   *T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n*, (9th Cir. 1987) 809 F. 2d 626, 631.

5   Plaintiff **need only present evidence from which a jury might return a verdict

6   in his favor**."  *Anderson,* 477 U.S. at 257 (emphasis added).

7   **III.   ARGUMENT**

8   **A.   Genuine Issues of Material Facts Exist Concerning Whether the Deadly

9   Force Was Reasonable Under the Circumstances.**

10   To establish a claim of excessive force under the Fourth Amendment, plaintiffs must

11   demonstrate: "(1) injury, (2) which resulted directly and only from a use of force that was

12   clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Tarver

13   v. City of Edna* (2005) 410 F.3d 745, 751.  Excessive force claims are necessarily fact-

14   intensive; whether the force used is "excessive" or "unreasonable" depends on "the facts

15   and circumstances of each particular case." *Graham v. Connor* (1989) 490 U.S. 386, 396;

16   see also *Brosseau v. Haugen* (2004) 543 U.S. 194, 201 (observing that this "area is one in

17   which the result depends very much on the facts of each case"). Factors to consider include

18   "the severity of the crime at issue, whether the suspect poses an immediate threat to the

19   safety of the officers or others, and whether he is actively resisting arrest or attempting to

20   evade arrest by flight." *Graham,* 490 U.S. at 396.

21   The California Supreme Court case of *Hayes v. County of San Diego* (2013) 57

22   Cal.4th 622, 639, is instructive in this case. The Ninth Circuit Court of Appeals requested

23   clarification from the California Supreme Court as to the law in California regarding the

24   use of deadly force by a law enforcement officer. Th California Supreme Court in *Hayes*

25   Court responded:

26   Law enforcement personnel's tactical conduct and decisions preceding the
    use of deadly force are relevant considerations under California law in

27   determining whether the use of deadly force gives rise to negligence liability.

28   Such liability can arise, for example, if the tactical conduct and decisions

57

show, as part of the totality of circumstances, that the use of deadly force was unreasonable. *Hayes v. County of San Diego* (2013) 57 Cal.4th 622, 639.

The rationale for the *Hayes* decision was based on the California Supreme Court's earlier decision in *Grudt v. City of Los Angeles* (1970) 2 Cal.3d 575, 587. Citing *Grudt*, the Court stated, "This Court has long recognized that peace officers have a duty to act reasonably when using deadly force . . . [t]he reasonableness of an officer's conduct is determined in light of the totality of circumstances." *Hayes v. County of San Diego* (2013) 57 Cal.4th 622, 629, citing *Grudt v. City of Los Angeles* (1970) 2 Cal.3d 575, 587.

The Court in *Grudt,* determined that the trial Court had erred in barring the claim of negligence against the law enforcement officers for unreasonable use of force. The *Hayes* Court in analyzing its own reasoning in *Grudt* stated:

> Significantly, the shooting in Grudt appeared justified if examined in isolation, because the driver was accelerating his car toward one of the officers just before the shooting. Nevertheless, we concluded that the totality of the circumstances, including the preshooting conduct of the officers, might persuade a jury to find the shooting negligent. *630 Ibid.) In other words, preshooting circumstances might show that an otherwise reasonable use of deadly force was in fact unreasonable. *Hayes v. County of San Diego* (2013) 57 Cal.4th 622, 629–630.

"However, a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern. In short, an officer's use of force must be objectively reasonable based on his contemporaneous knowledge of the facts." *Deorle v. Rutherford* (9th Cir. 2001) 272 F.3d 1272, 1281.

In *Deorle*, the Court found the officer's use of force to be excessive, violating the Plaintiff's Fourth Amendment rights. *Id*. at 1286. One of the Court's basis for its holding that the use of force was excessive was that there were numerous police officers present which would lessen the need for increasing the use of force. *Id*. at 1282-1283.

The tactics to be employed against an innocent bystander "are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense. In the former instance increasing

58

the use of force may in some circumstances at least exacerbate the situation; in the latter a heightened use of less than lethal force will usually be helpful in bringing a dangerous situation to a swift end." *Deorle v. Rutherford* (9th Cir. 2001) 272 F.3d 1272, 1281.

**B.** **The Discretionary Function Exception Does Not Apply in this Instance.**

"The reasonableness of an officer's conduct is determined in light of the totality of circumstances." *Hayes v. County of San Diego*, (2013) 57 Cal. 4th 622, 629. The Hayes court went on to say that a police shooting cannot be examined in isolation. Pre-shooting circumstances must be examined to determine whether or not the use of deadly force by the peace officer was in fact unreasonable. *Hayes* at p. 630. In responding to the Ninth Circuit's question to the California Supreme Court regarding the duty of peace officers to act reasonably when using deadly force, the *Hayes* Court held: "Law enforcement personnel's tactical conduct and decisions preceding the use of deadly force are relevant considerations under California law in determining whether the use of deadly force gives rise to negligence liability such liability can arise for example if the tactical conduct and decision show, as part of the totality of circumstances, that the use of deadly force was unreasonable." *Hayes* at p. 639.

Dated: July 3, 2023

LAW OFFICES OF VICTOR L. GEORGE


____*/s/ Meylin P. Alfaro*____
VICTOR L. GEORGE
MEYLIN P. ALFARO
Attorneys for Plaintiffs

PLAINTIFFS' RESPONSE TO DEFENDANT UNITED STATES OF AMERICA'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW