JS-6

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANAIT STEPANYAN ET AL., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | No. 2:20-cv-01774-CAS-BFMx <br> No. 2:20-cv-10868-CAS-BFMx <br><br> **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

## I.    INTRODUCTION

This case was tried to the Court on September 19, 2023, September 21, 2023, and September 22, 2023.  Attorneys Dale K. Galipo and Victor L. George of their respective law offices appeared on behalf of plaintiffs Anait Stepanyan, Kirakos Kesablyan, and Kadzhik Kesablyan, the individuals and heirs of decedent Vahram Kesablyan, and Anait Stepanyan as successor in interest to Vahram Kesablyan (collectively, "plaintiffs").  Assistant United States Attorneys Daniel A. Beck and Joseph W. Tursi appeared on behalf of defendant the United States of America (the "government").  On August 12, 2024, the Court held a post-trial hearing.  Based on the evidence and testimony presented at trial, as well as the arguments presented by the parties at the post-trial hearing, the

Court makes the following findings of fact and conclusions of law.[1]  To the extent any finding of fact is better characterized as a conclusion of law or a conclusion of law is better characterized as a finding of fact, they may be so characterized.

## II.    FINDINGS OF FACT

### A. Procedural Background

1.    Plaintiffs' claims arise from the fatal shooting of Vahram Kesablyan ("Vahram") by Federal Bureau of Investigation ("FBI") agents on January 8, 2018, while the agents were executing a search and arrest warrant for Vahram's son, Kirakos Kesablyan ("Kirakos").

2.    On February 24, 2020, plaintiffs initiated this lawsuit in federal court, naming the United States, FBI agent Hannah Monroe, FBI agent Renea Bromley, 20 unknown FBI agents, and Does 1 through 100 as defendants.  Dkt. 1 ("Compl.").

3.    On December 28, 2020, plaintiffs filed their operative complaint.  Dkt. 27 ("SAC").  On March 22, 2023, the Court dismissed several of plaintiffs' claims.  Dkt. 41.  The only remaining claims are for (1) assault and battery; (2) wrongful death; (3) negligence; (4) violation of California Civil Code Section 52.1; and (5) negligent infliction of emotional distress, all brought against the United States pursuant to the Federal Tort Claims Act ("FTCA").

4.    On June 14, 2023, the United States filed a motion for summary judgment.  Dkt. 81.  On July 24, 2023, the Court denied the motion.  Dkt. 89.

5.    On September 18, 2023, the parties submitted their Amended Final Pretrial Conference Order which included various stipulated facts to which all parties agreed.  Dkt. 119 ("Final Pretrial Conf. Order").  This Court adopts all such stipulated facts as findings of facts whether or not restated herein.

---

[1] To the extent the Court relies on evidence to which the parties have objected, as reflected in this order, those objections are overruled.  All remaining objections are overruled as moot.

6.      On September 19, 2023, this matter came before the Court for a three-day bench trial.  The parties called as witnesses SWAT Operator 1 ("Operator 1"), SWAT Operator 2 ("Operator 2"), SWAT Operator 3 ("Operator 3"), FBI Assistant Special Agent in Charge Patrick Grandy, FBI Special Agent Cody Burke, and Dr. Joseph Vallone.[2]  Dkt. 125.  Additionally, the Court received into evidence deposition testimony of plaintiff Kirakos Kesablyan.  Id.  The witnesses who were called at trial, the depositions of the foregoing witnesses, and the exhibits that were offered, admitted into evidence, and considered by the Court are identified in the witness and exhibit lists filed on September 22, 2023.  Id.

**B. Investigation of Kirakos**

7.      Anait Stepanyan was legally married to Vahram Kesablyan at the time of his death.  Dkt. 119 at 3 ("PTC").  Kirakos Kesablyan and Kadzhik Kesablyan are children of Anait and Vahram.  Id.

8.      On January 5, 2018, the federal government filed a criminal complaint against Kirakos in the Central District of California.  See USA v. Kesablyan, No. 2:18-cv-00054-PSG-2 (C.D. Cal.), dkt. 1 (criminal complaint).  FBI Agent Hannah Monroe was the complainant and provided an affidavit in support of the complaint, an arrest warrant, and a search warrant for Kirakos' home.  Dkt. 29 at 3.  The affidavit accused Kirakos of falsely claiming to be a United States Marshal while demanding money from a victim during a dispute over forming a cannabis business, in violation of 18 U.S.C. § 912.  Id.

**C. Preparation for Warrant Operation**

9.      In January 2018, law enforcement surveillance of Kirakos' residence on Horse Haven Street confirmed that an individual matching Kirakos' description was residing at the address.  PTC at 4.

---

[2] Three of the witnesses testified using aliases to protect their anonymity.

10.     The FBI decided to use SWAT for the warrant operation because Kirakos was a person of interest in several homicides and was associated with an organized crime group.  Id. at 4, 54.  This decision was approved by FBI Special Agent in Charge Danny Kennedy, Assistant Special Agent in Charge Patrick Grandy, a SWAT Coordinator, and a Senior SWAT Team Leader.  Id.

11.     The SWAT Operational Plan called for the FBI's SWAT team to serve warrants at 6:00 a.m. in the morning.  Id.

### D. Background of FBI Operators 1, 2, and 3, Cody Burke, and Patrick Grandy

12.     Operator 1 is currently a special agent and one of five SWAT team leaders in the FBI's Los Angeles field office.  Id. at 51.  He has an associate's degree, bachelor's degree, and juris doctorate, and practiced corporate securities law prior to joining the FBI's Los Angeles field office in 2012.  Id. at 52.  In October 2014, he joined the SWAT team.  Id.  Operator 1 estimates that, during his time with SWAT, he has participated in about half of the thousands of operations conducted by the team.  Id. at 53.  The SWAT team has required training five times a month and eight hours per week, including firearms qualifications, close quarter battles, and vehicle training.  Id.  SWAT operators also qualify on all firearms four times a year.  Id. at 64.

13.     Operator 1 was trained that deadly force should not be used unless there is an immediate or imminent threat of death or serious bodily injury.  Sept. 19 Tr. at 44.  He was also trained to give a verbal warning when feasible before using deadly force.  Id.  He was trained to, if possible, assess while firing shots.  Id.

14.     Operator 2 is currently an assistant team leader of the SWAT team in the FBI's Los Angeles field office.  Sept. 21 Tr. at 91.  He joined the FBI in 2009 and has been a member of SWAT since 2016.  Id. at 91-92.  He has a Bachelor of Arts degree in political science from the University of California at Los Angeles, and a Master of Arts in securities studies from Georgetown.  Id.  at 91-92.  He has been a part of hundreds of

SWAT operations.  Id. at 93.  Operators 1 and 2 are friends and sometimes socialize together.  Sept. 21 Tr. at 75-76.

15.    Operator 3 is currently the senior team leader of the SWAT team in the FBI's Los Angeles field office.  Id. at 128.  He has been with the FBI since 2004 and joined the SWAT team in 2010.  Sept. 19 Tr. at 90, 129.  At the time of this operation, Operator 3 was acting team leader.  Id. at 132.  He is about five foot nine inches tall.  Id. at 107.  He has had hundreds of hours of SWAT basic, weapons, medical, and rural training.  Id. at 129.  He has trained for a variety of scenarios, including active shooters, search and arrest warrants, fugitive manhunts, airline hijacking, terrorist attacks, dignitary protection, etc.  Id. at 129.

16.    Cody Burke has served as an FBI supervisory special agent in the Los Angeles FBI field office for the last five years.  Sept. 21 Tr. at 25.  In this role, he supervises the violent crimes squad and coordinates the violent crime program across the LA field office.  Id.  In January 2018, Burke was a special agent assigned to the violent crimes squad.  Id.  One of the responsibilities of the violent crimes squad is to investigate assaults on federal officers, which includes responding to and investigating agent-involved shootings.  Id. at 27.

17.    Agent Patrick Grandy is currently the Assistant Special Agent in Charge at the FBI's Los Angeles field office.  Sept. 22 Tr. at 2.  He has worked at the FBI since approximately 2006.  Id.  As the assistant special agent in charge, he oversees portions of the counterterrorism, weapons of mass destruction, and crisis response programs, including the SWAT team, for the LA field office.  Id. at 2-3.  He has a bachelor's degree in criminal justice and a master's degree in public safety administration.  Id. at 3.

18.    The LA field office primarily uses its SWAT teams for high-risk search and arrest warrant operations.  Sept. 19 Tr. at 129.  Typically, an investigative agent, squad, or supervisor will request SWAT assistance, coordinate with the senior SWAT team leader, and then seek approval from the special agent in charge.  Id. at 129.

### E. Pre-Operation Events

19.    On approximately January 4, 2018, agent Patrick Grandy was notified by the SWAT supervisor about an operation that would likely require SWAT assistance. Sept. 22 Tr. at 4.  Special Agent Grandy approved the use of SWAT.  Id.  He made his decision after considering the totality of the situation, including the nature of the arrest warrant, the lengthy criminal history of the subject of the arrest warrant (including for assault), the fact that the subject of the warrant was a suspect in several homicides, and numerous tactical challenges at the target property (e.g., the target property was surrounded by fencing, included vehicle and pedestrian gates which prevented approach from the sidewalk, had a security-type screen door, and had multiple surveillance cameras).  Id. at 7.  The Special Agent in Charge, Danny Kennedy, gave final approval for deployment of SWAT for this operation.  Id.  Grandy also approved the deployment of two sniper observer teams to "get a physical and visual presence of the property" prior to the commencement of the operation.  Id.

20.    On approximately January 5, 2018, Grandy reviewed and approved a SWAT operational plan (the "Operational Plan")[3] that was created for the execution of this arrest warrant.  Id. at 7-8; see Defendant's Exhibit No. 78.  The Operational Plan specified that, in accordance with standard procedure, adults at the residence would be secured and detained during the warrant service.  Id. at 8.  It also provided for a medical element/component.  Id. at 16-17.  The plan included photographs of the target residence to give a sense of the general structure of the property prior to the team's arrival.  Id. at 9.  Additionally, it included a photo of the subject of the arrest warrant.  Id. at 15.  The Operational Plan specifically provided:

Kesablyan has been under investigation by FBI LA, Glendale Police Department and LAPD Robbery and Homicide for several years as a close associate of

---

[3] The Court overrules plaintiffs' objection to the admission of the Operational Plan into evidence, as it is relevant to the operators' understanding of the riskiness of the operation and the level of care that they exercised when approaching the target residence.

numerous high level Armenian organized crime members and a drug trafficking

organization.  Kesablyan is currently a person of interest in two homicides, one as

recent as October 2017.  Kesablyan has an extensive criminal history to include

burglary, grand theft, forgery, assault with a deadly weapon, kidnapping,

transportation/sale of narcotics, and dissuading a victim or witness with threats[.]

Kesablyan has falsely claimed to be a "federal agent" and to be employed by the

United States Marshal Service.  Kesablyan made these claims in conjunction with

extortion threats.  Kesablyan has been charged with impersonation of a federal

officer[.]

Defendant's Exh. 78 at 1.

21.    In the early morning of January 8, 2018, members of the FBI's Los Angeles

Field Office SWAT Team assembled at a Tactical Operations Center (TOC) location

near Kirakos' residence.

22.    Operator 1, Operator 2, and Operator 3 (collectively, the "operators"), as

well as Grandy, were among the SWAT Team members assembled at the TOC.  See

Transcript of September 19, 2023 Record at 3 ("Sept. 19 Tr.").  Grandy served as on-

scene commander for the operation.  Sept. 22 Tr. at 9.  His general responsibilities

included responding to situations that might arise during the operation and, if necessary,

requesting or approving additional authorities beyond what was already approved in the

Operational Plan.  Id.

23.    All three operators were wearing standard issue FBI SWAT uniforms,

equipment belts, bullet proof vests, helmets, and eye protection.  Id. at 140.  Operator 1

was armed with a Glock 17 and a Colt M-4 assault rifle in the semi-automatic mode i.e.,

requiring separate trigger squeezes for each shot.  Id. at 3, 64.  The weapon fires a .223

caliber bullet.  Id. at 3.  Operator 3 was also armed with an M-4 rifle and a Glock 17 9-

millimeter pistol with a mounted tactical light.  Id. at 97, 99.  Operator 3 was similarly

armed.  Sept. 21 Tr. at 54.  FBI agents are not assigned tasers but carry pepper spray and

occasionally batons.  Id. at 59.  At this time, there was no policy regarding body cameras

or audio recording devices.  Sept. 19 Tr. at 10.  Accordingly, the operators were not equipped with body cameras or audio recording devices on the morning of the warrant operation.  Id.  SWAT also did not record radio transmissions or communications at this time.  Sept. 21 Tr. at 39.

24.    At the TOC, the team leader (Operator 6) read the FBI policy on deadly force to all individuals involved in this operation.  Id. at 47.  The policy provided that "[l]aw enforcement officers of the Department of Justice may use deadly force only when necessary, that is, when the officer has a reasonable belief that the subject of such force poses an imminent danger of death or serious physical injury to the officer or to another person."  Defendant's Exh. 78 at 5.

25.    At approximately 3:00 a.m., two SWAT Sniper/Observer teams received operational briefing at the TOC.  Sept. 21 Tr. at 48-49.  At approximately 3:30 a.m., the two teams deployed to positions behind Kirakos' residence.  Id.  An aerial asset also began streaming a live video feed of the residence to the TOC (the "FLIR video").

26.    In a subsequent briefing at around 5:00 a.m., Grandy gave a briefing where the participants discussed the Operational Plan, the situation, the mission, equipment, time estimates, and roles for each operator.  Id. at 55; Sept. 21 Tr. at 94; Sept. 22 Tr. at 10.  The operators were also provided information about Kirakos' criminal history as an individual with links to Armenian organized crime and as a suspect in two homicides.  Sept. 19 Tr. at 57; Sept. 21 Tr. at 95.  Operator 1 testified that Kirakos' criminal history did not affect their approach to this particular warrant operation because most subjects of SWAT team warrant operations have similar types of criminal history.  Id.  The team planned to detain the adults that were present at the residence that morning, pursuant to their standard procedures.  Id.

27.    Operator 1 was originally assigned to the back of the entry team, where he would be one of the individuals that would enter the residence and deal with people that were detained at the door.  Sept. 19 Tr. at 56.  Operator 2 was initially assigned to cover

the perimeter of the subject residence.  Id. at 95.  Operator 3 was initially assigned to support the entry team into the residence.  Sept. 19 Tr. at 134.

28.    At some point, Grandy and Operators 1, 2 and 3 learned that the overhead FLIR video showed that a truck had arrived at the residence and was blocking the driveway and that an occupant had exited the truck.  Sept. 19 Tr. at 57-58, 135; Sept. 21 Tr. at 55, 96, 100; Sept. Tr. 22 at 10.  Operator 1 observed the individual walk to the left side of the property toward some dogs, look around, walk back toward the residence, and then walk to the front of the residence.  Sept. 19 Tr. at 58.  He then appeared to look down the driveway on the right-hand side of the residence before re-entering the truck. Id.  At some point later, the occupant exited the vehicle again, walked down the street and around the perimeter of the property outside of the fence, and then re-entered the truck.[4]  Id. at 58, 135-36.

29.    Operator 1 believed that the occupant was "[w]alking the property in like [a] security type posture to see if people were in or around the property" in an attempt to "guard the property."  Id. at 62.  Operator 3 observed that this person had access to the property and looked like he was completing "a security sweep of the perimeter of the residence."  Id. at 135.  Operator 2 believed that this individual was associated with the target residence and appeared to be conducting a security sweep of the property.  Sept. 21 Tr. at 96, 98.

30.    During trial, pictures of the truck appeared to show that the back and driver's side passenger windows were tinted.  Plaintiffs' Exh. 62.

---

[4] Operator 1's testimony is consistent with the FLIR video, which shows Vahram entering the yard to the left of the property, stopping at the back where a few dogs were being kept, eventually walking back through the yard to the front of the property, looking down the driveway on the right-hand side of the residence, before re-entering his truck at the front of the house.  Plaintiffs' Exh. 73.  He later exited the truck again, walked down the street, looked down the street, and walked back and re-entered his truck.  Id.

31.     The SWAT team discussed how best to respond to the truck.  Sept. 19 Tr. at 136.  The FBI has the capability to run a license plate check to find the registered owner and then make a follow-up check for criminal history and database checks to find additional information about the person in question.  Sept. 22 Tr. at 14.  The SWAT team decided not to run the license plate of the vehicle for fear of compromising the operation, as the only way to get a license plate was to drive by the vehicle and residence.  Sept. 19 Tr. at 137; Sept. 21 Tr. at 48.  Grandy also testified that running a license plate would have provided "limited additional intelligence value" because it would not reveal the driver of the vehicle *in this instance*, regardless of who the vehicle was registered to.  Sept. 22 Tr. at 12.

32.     After conversation among the team leaders and leadership, Operator 1, Operator 2, and Operator 3 (the acting SWAT team leader) were tasked with clearing the Dodge Ram pickup truck and detaining its occupant.  PTC at 4, Sept. 21 Tr. at 5, 98.  A fourth operator, Operator H, was assigned to be ready to assist if needed e.g., if there were more than one person in the vehicle, if force escalated, if extra equipment were needed.  Sept. 21 Tr. at 5-6.  A three-man element is a standard team used to approach a vehicle such as that in this case.  Sept. 19 Tr. at 137.  After detaining the occupant, the operators planned to walk the occupant down the street to the right of the target residence so that, if something happened at the residence, neither the operators nor the occupant would be injured.  Sept. 19 Tr. at 9, 97, 138.  As on scene commander, Grandy approved this contingency plan.  Sept. 22 Tr. at 11.

33.     Operator 1 was directed to position himself near the front driver side area of the truck to cover the occupant.  Sept. 19 Tr. at 4-5.  His role was to "lead the team up to the vehicle and provide cover for . . . [Operator] 3 and [Operator] 2."  Id. at 62.

34.     Operator 2 was tasked with breaching the truck's window with a Halligan tool, if commanded by Operator 3.  Id. at 5, 63.  A Halligan tool is a three- to four-foot-long steel bar with a duck bill on one end and a pick and fork on the other end.  Sept. 21 Tr. at 56.  Operator 2 had used this tool in similar breaching operations at least a dozen

times.  Id. at 57, 99.  It may sometimes take several swings to breach a window.  Id.  The purpose of breaching a vehicle window is to gain better visibility, to get access to the door, and to gain compliance from the occupants by gaining control of their arms and hands.  Sept. 19 Tr. at 63, 139; Sept 21. Tr. at 99.  The SWAT team trains to breach vehicle windows, and it is standard procedure to breach the window if the occupant is not compliant.  Sept. 19 Tr. at 63, 139.  Operator 3 specifically instructed Operator 2 not to breach the window until commanded, but they did not discuss the exact factors that would inform Operator 3's decision.  Sept. 21 Tr. at 6, 99.  In Operator 3's past experience ordering vehicle window breaches, he has observed glass going into the car but has only seen it injure law enforcement officers and not other people.  Sept. 21 Tr. at 32.

35.    Operator 3, as the acting SWAT team leader, was responsible for identifying himself and the team and providing verbal commands to the occupant i.e., the "knock and announce."  Sept. 19 Tr. at 5, 63, 91, 139; Sept. 21 Tr. at 60.  One reason the knock and announce is important is because it informs the occupant that the operators are with law enforcement and not members of a rival criminal gang.  Id. at 94-95.  SWAT operators are trained that, ideally, only one operator should give commands to avoid confusion.  Id. at 106.  However, in extenuating circumstances, other operators may also give commands.  Id. at 106.  Extenuating circumstances may include situations where a different operator is able to see things that the operator responsible for giving primary commands cannot see.  Id. at 140.  In this situation, the other operator may give commands or warnings if he sees something that could be dangerous or fatal.  Id. at 140.

36.    The entire team practiced and rehearsed the plan to approach the vehicle at the TOC using cones and/or yellow target vehicles.  Id. at 63, 84.  Operator 2 did not recall any discussion regarding specific planned commands because such commands are standard.  Sept. 21 Tr. at 59.

37.    Operator 1 believed that the truck had a single occupant.  Sept. 19 Tr. at 7.  Operator 3 knew that at least one occupant had been observed on video but did not know

if there were other occupants in the vehicle.  Id. at 91.  Operators 1, 2, and 3 did not know who the observed occupant was.  Id. at 7, 91; Sept. 21 Tr. at 55-56.  Operators 1 and 3 were unaware of whether anybody ran the license plate of the vehicle to identify the registered owner.  Id. at 8, 97.  At this time, there was no indication that the occupant had a criminal history, a gun, or a history of past violence.  Id. at 96.  The operators were unable to eliminate the possibility that the occupant was the subject of the warrant because they were unable to confirm whether the male observed in the house by the snipers was the suspect.  Sept. 21 Tr. at 7, 56.

38.    Operator 1 does not recall being informed that there were four young children in the house but acknowledged that it is important to know any occupants present at a residence that is the subject of a warrant operation.  Sept. 19 Tr. at 9.  Occupant 3 testified that the team surely took into consideration the presence of children at the home when planning the operation.  Sept. 21 Tr. at 36.  Grandy does not recall being informed that there were children at the residence.  Sept. 22 Tr. at 15.

39.    At his deposition, Kirakos testified that Vahram typically arrived at 6:00 a.m. or 6:30 a.m. to take Kirakos' children to school.  Sept. 22 Tr. at 17-18.  Kirakos testified that, on the morning of the operation, Vahram arrived at 5:20 a.m. after Kirakos called him about the dogs barking abnormally.  Id.

40.    The Rose and Alex Pilibos Armenian School started at 8:10 a.m. during the 2017/2018 school year.  Students could be dropped off at the school at 7:30 a.m.  Students dropped off before 8:10 a.m. are automatically ushered to the extended care room where there is no sign-in for those children.  PTC at 5.

### F.  Execution of the Warrant Operation

#### i.    Initial Approach to Truck

41.    At approximately 5:55 a.m., the SWAT team departed the TOC.  See Sept. 19 Tr. at 6.  It arrived at the residence within a few minutes, approaching from the right to the left of the residence.  Id. at 6, 64.  The FLIR downlink did not indicate any movement in the truck in the 20 or 30 minutes prior to the SWAT team's arrival.  Id. at

78.  Operator 1 testified that, while the sun had not yet risen, there was still "good illumination" such that he was able to see when they arrived.  Id. at 10.  In an earlier statement, Operator 1 had noted that it was dark outside when he arrived at the residence.  Id. at 12.  Operator 3 testified that it was dark and drizzling outside.  Id. at 98.  Operator 2 testified that it was generally dark.  Sept. 21 Tr. at 55.

42.  The operators approached the truck from behind in a three-man wedge-shaped element, with Operator 1 in the lead and Operators 2 and 3 slightly behind.  Sept. 19 Tr. at 65.  Operator 1 was holding his rifle.  Id. at 13.  Operator 3 was in the middle, holding his handgun in his right hand and planning to knock on the window with his left hand.  Id. at 49, 97-98, 130.  Operator 2 had his M4 slung on his back and was holding the Halligan tool.  Sept. 21 Tr. at 77, 101.  Pursuant to their standard procedure, the operators approached the truck such that they had the most concealment and cover prior to getting to the vehicle.  Id. at 64-65, 81-82.  The operators did not announce their presence prior to taking their positions at the vehicle because they did not want to alert the occupant while they were approaching.  Id. at 82, 141.  Operator 3 testified that providing a warning might allow the occupant to retrieve a weapon, drive away, or warn other individuals.  Id. at 142.

### ii.  Arrival and Initial Observations at Truck

43.  As Operator 1 passed the truck's window, he panned around and glanced inside where he saw a silhouette.  Id. at 13.  He did not observe any light coming from inside the truck.  Id. at 79.  Upon reaching his position near the left front tire, Operator 1 pointed his rifle at the truck's occupant.  Id.  at 13.  The rifle had a tactical light attachment which Operator 1 also pointed at the truck's occupant to attempt to illuminate the inside of the vehicle.  Id. at 15.

44.  Operator 1 observed that the occupant of the vehicle was a middle-aged white male who was not the subject of the search warrant.  Id.  The occupant was leaning back in his seat.  Id.  Operator 3 testified that the seat was somewhat reclined, and the occupant was leaning back in the seat.  Id. at 101, 104.  Photos of the vehicle show a red

handicap placard in the window, although Operator 1 does not recall ever seeing the placard. Id. at 1. Operator 1 was unable to see the occupant's entire body, as part of his view was obstructed by the vehicle's dashboard. Id. at 16-17. He was able to see down to the top of the occupant's stomach, approximately six to ten inches below the chin. Id. at 17. He could see more or less depending on whether the occupant moved forward or backward, but at no point could he see the occupant's waist. Id. at 17-18.

45.    Operator 3 testified that it was difficult to see clearly through the window because the driver side windows were tinted. Id. at 98. He believed that the occupant was an adult male, approximately late 50s/early 60s. Id. at 100; Sept. 21 Tr. at 10. He shined the light mounted on his handgun into the truck for a few seconds, but then turned it off because it did not provide much additional assistance. Sept. 19 Tr. at 99, 101. While doing so, his weapon was pointed in the general direction of the occupant. Sept. 21 Tr. at 15-16. He never had a clear view of the occupant until the occupant was later removed from the truck. Sept. 21 Tr. at 31.

46.    Operator 2 took a position slightly behind and offset to the right of Operator 3, who was at the driver's door. Sept. 21 Tr. at 60. From his vantage point, he could see there was a person in the vehicle. Id. at 77. Operator 2 testified that he had no trouble seeing into the vehicle and was able to see the occupant's facial expressions very clearly through the tinted glass.[5] Sept. 21 Tr. at 65, 101. He believed the occupant to be over 40 years old. Id. at 66. He testified that the occupant appeared alert, and that he could see the occupant's eyes. Sept. 21 Tr. at 101. He observed movement in the vehicle as soon as he could see the occupant. Id. at 121

### iii.    Knock and Announce

47.    At the same time Operator 1 pointed his rifle at the occupant, he simultaneously heard Operator 3 conduct the knock and notice and was aware that

---

[5] However, Operator 2 later testified that he did not see the driver's face until after the knock and notice. Sept. 21 Tr. at 120.

14

Operator 2 was somewhere near Operator 3. Sept. 19 Tr. at 13. A typical SWAT knock and announce involves a knock on the door, announcements identifying the operators as the FBI, followed by positive commands. Id. at 65. Here, Operator 3 knocked on the window, yelled out "FBI" or words to that effect at least once, and commanded the occupant to put his hands up and/or show his hands.[6] Id. at 15, 21, 95, 104, 143; Sept. 21 Tr. at 16, 60. Operator 2 heard Operator 3 announce "FBI" at least twice. Sept. 21 Tr. at 61, 102. At the same time, Operator 3 attempted to open the door with his left hand, but the door was locked. Sept. 19 Tr. at 105, Sept. 21 Tr. at 20.

48.    Operator 1 testified that the occupant appeared to have been initially startled by the knock and notice. Id. at 14. Operator 1 testified that the driver did not appear to be asleep. Id. at 66. Operator 3 testified that he did not know whether the occupant was asleep. Id. at 101. In his deposition, he testified that the knock and announce may have woken the occupant up. Id. at 103.

49.    Operators 2 and 3 recall the occupant saying a word or two but could not make out the words. Id. at 108; Sept. 21 Tr. at 61. Operator 2 characterized the words as "guttural aggressive . . . yells." Id.

50.    Within a few seconds, Operator 1 saw the occupant put his hands up at approximately shoulder level, which Operator 1 interpreted as an act of compliance.[7] Sept. 19 Tr. at 15, 16, 20. Operator 1 did not see anything in the occupant's hands. Id. at 16. Operators 1 and 2 believed that the occupant knew that the operators were with the FBI, based on the verbal commands and the operators' uniforms. Id. at 21; Sept 21 Tr. at 61. Operator 3 briefly saw the occupant put his hands up, "but then after that [he] did not see [the occupant's] hands any more." Sept 19 Tr. at 104, 143. He never saw the

---

[6] In his statement, Operator 3 only said he initially yelled "FBI" and did not indicate that he immediately commanded the occupant to show his hands. Sept. 21 Tr. at 19. He did indicate that he commanded the occupant to show his hands at a later point in time. Id.

[7] Operator 2 testified that, from his perspective, the "subject was noncompliant the entirety of the duration of our encounter." Sept. 21 Tr. at 106.

occupant put his hands up by his shoulder.  Sept. 21 Tr. at 21.  He testified that his view of the occupant's hands was potentially impacted by factors like his angle, the darkness, and his height.  Sept. 19 Tr. at 108, 143.

51.     Operator 2 testified that the occupant was moving his hands "at or around his midline" but did not put his hands up and did not comply.  Sept. 21 Tr. at 62, 68.  At his deposition, Operator 2 testified that the occupant's hands were up at some points and down at some points.  Id. at 86.  At trial, he clarified that he meant the occupant's hands were at some points up near his belly button and at some points down near his lap near the waistband.  Id. at 113.

52.     A second or two later, Operator 3 gave an additional command for the occupant to either unlock or open the driver-side door.[8]  Sept. 19 Tr. at 21, 24, 105-106, 144; Sept. 21 Tr. at 63.  Operator 1 observed the occupant start to move his hands toward the door, which Operator 1 viewed as another act of compliance.  Id. at 22.  The occupant's hands were high enough to be seen above the dashboard and steering wheel.  Id. at 26.  Operator 3 did not see the occupant's hands but saw his shoulders and upper torso move towards the door.  Id. at 107.[9]  Operator 3 explained that, if the occupant's hands were at shoulder height and the occupant slowly reached towards the door's locking mechanism, he would have been able to see the occupant's hands doing so from his vantage point.  Id. at 110-11; Sept. 21 Tr. at 29.  However, "[i]f it was a very quick motion and [the occupant's] hands were below the windowsill," he would not have been able to see the hand movement.  Sept. 19 Tr. at 110-11.  Operator 3 testified that he did not see the occupant move his hands toward the door or door locking mechanism.  Sept. 21 Tr. at 21.

---

[8] Plaintiffs' counsel questioned Operator 3 as to whether this command conflicted with the previous command for the occupant to put his hands up.  Sept. 21 Tr. at 25.

[9] Operator 3 later testified that he may have very briefly seen one of the occupant's hands when the occupant turned his upper torso.  Sept. 21 Tr. at 18.

53.     During this period, Operator 2 was positioned behind Operator 3 and was looking over Operator 3's left shoulder.  Sept. 21 Tr. at 65.  Operator 2 testified that he saw both of the occupant's hands "dart . . . from his waistband belly button over to the side of the door" toward the locking mechanism.  Id. at 69, 78, 102.  Based on his past experience, as well as Operator 2's observation of the occupant's aggressive demeanor, shouting, and noncompliance, Operator 2 believed that the occupant was attempting to make sure the door was locked.  Id. at 103.  He never heard the locking mechanism go off.  Id. at 114.  In Operator 2's statement, there is no indication that any of the operators attempted to open the door again after this point.  Id. at 116.  He testified that the occupant appeared "[v]ery aggressive" and was "turned towards us postured up . . . as someone would do in [a] defiant fashion."  Id. at 103.

54.     From Operator 1's perspective, the occupant then appeared to look at him, stiffened up, opened his eyes wide like he was ready to fight, and moved his hands toward his right waistband and out of Operator 1's view.  Sept. 19 Tr. at 35, 36, 66, 85.  The window was subsequently broken.[10]  Id. at 36.  Operator 3 testified that, after the occupant's upper torso moved to face him, the occupant then "turn[ed] forward and [Operator 3] couldn't see [the occupant's] hands."  Id. at 144.  Operator 2 observed the occupant move his hands down near his waistband.  Sept. 21 Tr. at 103.

55.     To the extent there is a discrepancy between the testimony of Operators 2 and 3 regarding whether the occupant's hands were visible, the Court credits the testimony of Operator 3 as more consistent with Operator 1's testimony, particularly because Operator 2 was positioned the furthest from the truck relative to the two other operators.

56.     Operator 1 testified that, in response to the occupant's movements, Operators 2 and 3 both commanded the occupant to put his hands up.  Id. at 66-67.

---

[10] At his deposition, Operator 1 testified that that he did not recall whether this movement occurred before or after the glass was broken.  Id.

17

Operator 3 also heard at least one of the other operators begin giving warnings and commands. Sept. 21 Tr. at 28. Operator 1 does not recall whether he himself commanded the occupant to put his hands up before or after the window was shattered. Sept 19 Tr. at 75. He does not recall saying or hearing a command to "get your Fing hands up." Id. at 77.

### iv. Window Breach

57. One of the warnings that Operator 3 heard was someone yelling that the occupant was reaching toward his waistband.[11] Id. at 116, 144. Operator 3 gave the order to breach the window, in part because he was having trouble seeing inside the car and because he could not see the occupant's hands. Id. at 112-13, 144. In his statement, Operator 3 attributed his decision to his inability to see inside the car, as well as to the occupant's noncompliance and the warnings by the other operators regarding the occupant reaching toward his waistband. Id. at 14, 147. Prior to giving the order, Operator 3 did not see any weapon inside the car and did not hear anyone yell out that they saw a weapon in the car. Id. at 116.

58. Operator 3 stepped back to allow Operator 2 to approach and break the window. Id. at 112. He also holstered his handgun to prepare to open the door and put hands on the occupant in the event he still could not see the occupant's hands after the window was broken.[12] Id. at 118, 120; Sept. 21 Tr. at 33. He testified that, when he

---

[11] Operator 1 did not recall hearing anybody say "hit it" or "waistband, waistband, waistband" at any point. Sept. 19 Tr. at 18, 38. Operator 2 also testified that he yelled "waistband, waistband, waistband" *after* he smashed the window and stepped back. Sept. 21 Tr. at 105. Given that Operator 1 testified that he did not recall hearing any warnings of "waistband", the Court does not consider such warnings as a part of the totality of the circumstances when analyzing the reasonableness of deadly force below.

[12] At a later point in time, Operator 3 testified that he does not remember if he holstered his weapon at the time of breach or after the breach. Sept. 21. Tr. at 30. The Court finds that this fact is not essential to the Court's ultimate decision and therefore declines to resolve the discrepancy.

1  holstered his weapon, he did not believe he was in a life-threatening situation. Id. at
2  119-20.

3      59.    Operator 2 heard Operator 3 command to "hit it" in a "low and subdued . . .
4  conversational" tone and subsequently stepped toward the window. Sept. 21 Tr. at 70,
5  104. As he stepped up and began swinging the Halligan tool, he observed the occupant's
6  hands "digging in" towards his waistband or belly button area. Id. at 70, 79, 104. He
7  also observed the occupant raise his pelvis. Id. at 81-82. Operator 2 swung the duck-bill
8  end of the Halligan tool at the top of the window with both hands and struck the window
9  at least once, breaking the glass. Id. at 70, 78. He then quickly scraped away some
10 remnant glass before stepping away. Sept. 21 Tr. at 84. He at some point said, "get your
11 hands up, get your fucking hands up." Id. at 70-71, 104.

12     60.    Operator 2 testified that, after stepping back, he also yelled "waistband,
13 waistband, waistband."[13] Id. at 105. Based on his experience personally drawing an
14 "appendix holstered weapon" as well as his time working violent crimes cases, Operator
15 2 believed that the occupant "was reaching towards his waistband to draw an appendix
16 holstered weapon." Id. at 105-06. Operator 2 testified that, after a handgun is out of the
17 holster, it typically takes less than a second to raise it and point it at someone. Id. at 106.
18 Operator 2 testified that he was not directing Operator 1 to shoot the occupant by yelling
19 "waistband." Sept. 21 Tr. at 123.

20     61.    Approximately twelve seconds passed between the time of the operators'
21 approach to the vehicle and the time the operators smashed the truck's window. Id. at
22 16. Operator 3 testified that approximately eight to ten seconds passed between his
23 command to unlock the door and the breaking of the window. Id. at 109.

24
25
_____

26 [13] In Operator 2's deposition, he testified that he yelled "waistband" *while* he was
27 swinging the breaching tool. Sept. 21 Tr. at 118. The Court finds that this fact is not
   essential to the Court's ultimate decision and therefore declines to resolve the
28 discrepancy.

19

62.     Immediately after the window was broken, Operator 3 saw the occupant's upper head and torso move away from the window.  Id. at 117.  Operator 2 testified that the occupant appeared to be in momentary shock, and his hands momentarily came away from his waistband.  Sept. 21 Tr. at 83.  Operator 2 did not see anything in the occupant's hands at that point.  Id.  He then saw the occupant immediately drive his hands down towards his waistband.  Id. at 84.

63.     Operator 3 stepped toward the truck to attempt to put hands on the occupant.  Sept. 19 Tr. at 118.  While stepping forward, Operator 3 was concerned the occupant possibly had a gun.  Sept. 21 Tr. at 34.  Operator 3 testified that he still would have tried to put hands on the occupant even if the occupant was reaching toward his waistband, but he would not have gone hands on if he had known the occupant was reaching specifically for a gun.  Sept. 19 Tr. at 121-22.  He also testified that, depending on a "myriad of factors," he still may have attempted to go hands on even if he had seen a gun in the truck.[14]  Id. at 122.  He did not hear a verbal warning that shots were going to be fired and did not expect the shots as he reached through the open window.  Id. at 124.

64.     While looking into the window, Operator 3 never saw a gun or holster and did not specifically see the occupant tugging at his waistband.  Id.; Sept. 21 Tr. at 35.  From his vantage point, he would not have been able to see whether the occupant lifted his shirt unless the shirt was lifted to the occupant's chin.  Sept. 21 Tr. at 25.  However, he knew that the occupant's hands were out of sight, and that the occupant was not obeying his commands.  Sept. 19 Tr. at 124.

65.     Operator 2 did not hear any commands being given after the breach and before the shooting.  Sept. 21 Tr. at 119.  The occupant was not commanded to exit the truck.  Id. at 120.

---

[14] However, in his deposition, Operator 3 testified that he would have backed away if he saw a gun in the truck.  Id. at 122.

### v.    Shots Fired

66.    According to Operator 1, after the window was broken, the occupant continued to move his hands toward his right-hand side and appeared to be "trying to gain access to a weapon."  Sept. 19 Tr. at 67.  Operator 1 based his belief on his personal experience carrying a weapon in the waistband and the "hundreds, if not thousands of times," he had observed other people drawing weapons from the waistband.  Id.

67.    He testified that the movements associated with drawing a weapon from the waistband are very distinct, where a person's left arm typically moves the shirt out of the way, their right shoulder moves up and then back down as they try to gain access to the weapon with their right arm, and ultimately the person leans back slightly and moves their stomach a little forward to try to give more space to draw from a seated position before tugging up.  Id. at 67, 70.

68.    Operator 1 testified that he observed the occupant perform this "[s]equence of movement."  Id.  While Operator 1 could not see the occupant's hands, he observed the occupant's "left arm move . . . up to try and pull up on his clothing and his clothing started crinkling up."  Id. at 68.  He could also "see [the occupant's] right arm, his shoulder move up, and then his arm go back down as if he was trying to gain access to his waistband."  Id.  He then saw the occupant's arm "pull back up again as if he had cleared the firearm from the holster."  Id.  He later testified that he "never saw his arm come up, but [] saw his shoulder go up which [meant] shortly thereafter, his arm and hand [were] [going to] come up with a firearm."  Id. at 88.  Operator 1 testified that the occupant began tugging on his shirt after the window was smashed.  Id. at 88.

69.    At trial, Operators 1 and 2 both testified that they did not know the color of the occupant's shirt, whether it was long or short sleeve, and whether it was tucked in or not.  Id. at 86; Sept 21 Tr. at 79.

70.    At this point, Operator 1 fired.  Sept 21 Tr. at 68.  He believed this was the last possible moment he could wait before he or his teammates would have been shot by

the occupant.  Id. at 69.  His decision was based only on the occupant's actions, not on information about the target of the warrant operation.  Id. at 75.

71.    He estimates that around a quarter of a second passed between when he decided to shoot and when he fired the first shot.  Id. at 69.  He continued to fire for approximately one-and-a-half seconds and fired a total of five rounds.  He testified that he was trained to aim at a target's center mass, but here he was tracking the occupant's hands, and his rifle followed the occupant's hands.  Sept. 19 Tr. at 39-40.  He also testified that the bullets would exit the rifle and impact the target approximately three inches lower than where Operator 1 was aiming.  Id. at 87.

72.    Operator 1 stopped firing when the occupant's body went limp and his arms stopped moving, as he has been trained to stop firing when the threat is no longer a threat.  Id. at 43-44, 69.  At the time he fired, Operator 1 believed that Operator 3 was generally near the driver's side door.  Id. at 51.  He did not know where Operator 3's firearm was at that time.  Id. at 89.

73.    Operator 1 estimates that, based on his review of the video captured by the aerial asset, approximately four seconds passed between the time the operators smashed the truck's window and Operator 1 firing the shots.  Sept. 19 Tr. at 30.  Operator 3 estimates that five to seven seconds passed between the window breach and the shots being fired.  Sept. 21 Tr. at 71.

74.    Prior to firing, Operator 1 did not see any gun or weapon in the truck and did not see any object in the occupant's hand at any time.  Sept. 19 Tr. at 4.  He gave no verbal warning that he was about to fire to either the occupant or Operators 2 and 3.  Id. at 4, 51.  He never heard the occupant say anything.  Id. at 20.  Immediately before firing, Operator 1 could see from the occupant's elbows up on both arms but could not see his hands.  Id. at 37-38.  Operator 2 also never saw a gun or holster prior to shots being fired.  Sept. 21 Tr. at 71.

75.    The shots were fired about a second or two after Operator 3 began moving back toward the truck to put hands on the driver.  Id. at 118, 131.  Operator 3 was not

expecting shots at that moment.  Sept. 21 Tr. at 35.  He felt glass going into his face and body.  Sept. 19 Tr. at 118.

76.    Operator 1 was aware that shooting someone in their upper body with his rifle from this distance was likely to cause death or seriously bodily injury.  Sept. 19 Tr. at 40.

### vi.    After Shots Fired

77.    Operator 3 moved back after feeling the glass hit his body and, in the moment, did not know if he had been shot or not.  Id. at 125.  A few seconds later, he saw the injuries on the occupant's chest and realized that the occupant had been shot.  Id. He observed that the occupant went limp.  Sept. 21 Tr. at 37-38.  Operator 2 saw that the occupant was bleeding profusely and heard gurgling sounds.[15]  Id. at 73.

78.    When Operator 2 heard shots fired, he stepped back, set the Halligan tool down, unslung his M4 from his shoulder, raised his M4, and stepped back into a cover position.  Sept. 21 Tr. at 106.  He testified that he was not surprised that shots had been fired because the occupant was noncompliant and had attempted to draw a gun on law enforcement after they had duly announced their presence and given commands.  Id. at 107.

79.    Operator 3 looked into the window and observed there were no other occupants.  Sept. 21 Tr. at 38.   He then signaled that shots were fired over his radio. Sept. 19 Tr. at 148.  He instructed Operator H to work with Operator 2 to get the occupant out of the truck.  Sept. 21 Tr. at 39, 108.

80.    Grandy was at the TOC watching the FLIR feed and heard the radio call of shots fired but did not see shots fired on the FLIR at the time.  Sept. 22 Tr. at 13. Shortly thereafter, Grandy asked a counterpart at the TOC to deploy emergency medical services to the scene to assist with rendering aid.  Id.  He also began notifying the

---

[15] Operator 2 later testified that he made these observations while he was pulling the occupant from the car.  Sept. 21 Tr. at 107.

23

Special Agent in Charge, the chief division counsel, and other individuals at the TOC that there had been a shooting during the service of the warrant. Id.

81. Operator 3 testified that, immediately after the shots, one of the other operators unlocked the door, and Operators 2, 3, and H opened the door. Sept. 19 Tr. at 125; Sept 21 Tr. at 22-23, 40. Operator 3 does not recall who unlocked the door. Sept. 19 Tr. at 125. Operator 2 recalls that Operator 3 reached inside the window and unlocked the door. Sept. 21 Tr. at 72, 107. Operator 2 slung his rifle back over his shoulder and pulled the door open. Sept. 21 Tr. at 72, 107.

82. After the door was opened, Operator 2 put his hands on to grab the occupant's upper torso, and Operator 3 saw a handgun in the occupant's lap near his hands.[16] Sept. 19 Tr. at 126-28; Sept 21 Tr. at 40, 72. Operator 3 also saw a holster toward the middle of the occupant's belly button area inside the center of his waistband. Sept. 21 Tr. at 126-27. Operator 3 subsequently instructed Operator 2 and Operator H to move the occupant out of the vehicle so that they could render medical aid. Sept. 21 Tr. at 40.

83. As the occupant was being pulled out of the truck, Operator 3 saw the handgun fall from the occupant's lap to the floorboard. Sept. 19 Tr. at 126-28, 149; Sept. 21 Tr. at 43. Operator 2 saw a holster in the center of the occupant's waistband as he was pulling the occupant out.[17] Id. at 73, 107. He did not see the gun fall to the floorboard but did see a gun on the floorboard after the occupant had been pulled from the truck. Id. at 74, 108, 122-23.

---

[16] Operator 3's statement did not say that he saw a pistol in the vehicle prior to the occupant being removed, only that he observed a waistband holster. Sept. 21 Tr. at 43. In the statement, Operator 3 mentioned a pistol falling to the floorboard when the occupant was being pulled from the truck. Id.

[17] Operator 2 later testified that he saw the holster on the occupant's waistband as soon as the door opened. Sept. 21 Tr. at 89-90.

84.    At some point, Operator 3 verbally announced "gun" to alert the other operators.  Sept. 21 Tr. at 44.  Operator 2 does not recall hearing anybody say "gun" before he pulled the occupant out.  Sept. 21 Tr. at 87.  Operators 2 and 3 do not recall whether the occupant was wearing a seatbelt.  Sept. 19 Tr. at 127; Sept. 21 Tr. at 120.

85.    The Court finds that the timing of the gun's discovery is not relevant to the Court's ultimate analysis, which focuses on the operators' pre-shooting knowledge/conduct.  Accordingly, the Court does not resolve any discrepancies in testimony regarding when the gun was discovered at this time.

86.    The operators took the occupant out of the vehicle and laid him on the ground next to the truck.  Sept. 19 Tr. at 41-42, 127.  As the occupant was being pulled out of the truck, Operator 1 noticed his shirt was "kind of pulled up," and there was an empty in-waistband holster near the right side of the occupant's torso.  Id. at 43, 71.  Operator 1 did not look into the car to see if there was a gun because he was still providing cover.  Id. at 43.  He never saw a gun in the car but was later told that a gun was recovered at the scene.  Id. at 43, 80.

87.    Operator 3 estimates that approximately 45 seconds passed between the time of the knock and notice and the time the occupant was removed from the car.  Sept. 21 Tr. at 49.  The FLIR video appears to show that approximately 12 seconds passed between the knock and notice and the window breach, and an additional 3-4 seconds between the window breach and the shots being fired.  Plaintiffs' Exh. 73.

88.    The operators proceeded to provide medical care to the occupant.  Sept. 19 Tr. at 71.  Operator 3 notified medics on the eastern side of the property to be prepared to transport the occupant.  Id. at 150.  He also directed the other operators to put chest seals on the occupant's chest wound.  Id.  Operator 2 shaved the occupant's chest and applied chest seals, which are used to plug bullet wounds in chest cavities that cannot be plugged with gauze.  Sept. 21 Tr. at 108.  The operators then put the occupant on a stretcher and used a needle to try and relieve any air pressure from the occupant's

1  lungs.[18]  Sept. 19 Tr. at 150-51.  The occupant was turned over to FBI medics and was

2  taken by Operator 2 and the medics to the ambulance within a few minutes.  Id. at 151;

3  Sept. 21 Tr. at 110.

4  **G. Aftermath of the Warrant Operation**

5        **i.**      **Autopsy**

6      89.    Vahram was taken to the on-scene ambulance, taken to the local hospital,

7  and was subsequently pronounced dead.  PTC at 5.

8      90.    After the operation was complete, Grandy instructed all the SWAT team

9  members to preserve any materials related to the service of the warrant.  Sept. 22 Tr. at

10  13.

11      91.    At some point, Dr. Joseph Vallone performed an autopsy on Vahram's

12  body.  Dr. Vallone worked as a medical examiner in the LA County Medical Examiner

13  Coroners Office from 2017-2022.  Sept. 21 Tr. Pt. 2 at 2.  He currently works in the

14  Ventura County Medical Examiner's Office as an associate forensic pathologist.  Id. at 2,

15  15.  He estimates that he has performed "[a] little over a thousand" autopsies in his

16  career, including many that involved death by gunshot wounds.  Id. at 2.

17      92.    Dr. Vallone ascribed Vahram's death to "multiple gunshot wounds."  Id. at

18  3.  He described the manner of death as homicide.  Id.  Dr. Vallone numbered the

19  gunshot wounds for the purposes of discussion/description; the wounds were not

20  necessarily numbered in the order they were sustained.  Id.

21      93.    Dr. Vallone testified that, as a general matter, some gunshot wounds have

22  both an entry and exit while others have only an entry and no exit.  Id.  Additionally, if

23  bullets travel through an intermediary object such as a windshield prior to impact, the

24  entry wound may sometimes appear different relative to a gunshot wound where the

25  bullet did not travel through an intermediary object.  Id.  The intermediary object may

26

27

28  [18] Operator 2 testified that they administered an NPA, which involves putting a rubber tube up someone's nose to provide them an airway to breathe.  Sept. 21 Tr. at 108.

affect the movement of the bullet through the air such that the bullet enters either sideways or is broken into pieces rather than "entering like a spinning football." Id. Thus, wounds sustained by a bullet that traveled through an intermediary object "can be larger or more irregular." Id.

94.    Gunshot wound #1 entered the body at the right shoulder and exited the right posterior shoulder. Id. at 4. The bullet trajectory was front to back, slightly upward, with minimal right to left direction. Id. at 4-5. This wound was not fatal. Id. at 5. In the autopsy report, the wound is described as an "indeterminate range rifle wound." Id. at 17. An indeterminate range wound is a wound that does not have contact or intermediate contact features, potentially indicating that there were intermediate objects blocking the bullet prior to impact. Id. Intermediate objects, particularly hard objects, between a firearm and the person who is struck by the firearm are sometimes able to deflect the trajectory of bullets. Id.

95.    Gunshot wound #2 entered the body at the right chest and exited the right upper back in the scapular region. Id. at 6. It passed through the right anterior ribs 2 and 3, right upper lobe of the lung, the right posterior ribs 3 and 4, and the right scapula. Id. The bullet trajectory was front to back, slightly upward, and slightly left to right. Id. This wound was fatal because it passed through the right lung. Id. It caused other injuries, including fractures on the ribs and a tear in the right scapula. Id.

96.    Gunshot wound #3 entered the body at the right chest, near gunshot #2, and exited the right upper back. Id. at 7. The bullet passed through right anterior ribs 2 and 3, the right upper lobe of the lung, and right posterior ribs 3 and 4. Id. The bullet trajectory was front to back, slightly upward, and slightly left to right. Id. The wound was also fatal because it passed through the lung, causing internal bleeding and preventing oxygen from entering the blood. Id.

97.    Gunshot wound #4 entered the right upper quadrant of the abdomen, slightly above the belly button and off to the left, and did not have an exit wound. Id. at 8, 18. The bullet passed through the liver and the twelfth thoracic vertebrae and also

1   penetrated the spinal cord.  Id.  The bullet trajectory was front to back and right to left.

2   Id.  The wound was fatal because it passed through the liver.  Id.  A deformed bullet was

3   recovered during the autopsy.  Id. at 17.  Dr. Vallone testified that it is unclear what

4   deformed the bullet, and it is possible that a metal object may have deformed the bullet.

5   Id.

6       98.    Gunshot wound #5 entered the right upper quadrant of the abdomen, near

7   gunshot #4, and did not have an exit wound.  Id. at 8.  The bullet passed through the liver

8   and diaphragm and terminated in the pleural space.  Id.  The bullet trajectory was front to

9   back and slightly upward.  Id.  The wound was fatal because it passed through the liver.

10  Id. at 9.  The autopsy revealed bullet fragments within the right pleural space, but no

11  bullet was recovered.  Id. at 20.

12      99.    Gunshot wound #6 entered the medial aspect of the right forearm below the

13  elbow and exited above the elbow.  Id. at 10-11.  The bullet passed through the

14  subcutaneous tissue of the arm i.e., the soft tissue under the skin.  Id. at 11. The bullet

15  trajectory was upwards right to left.  Id.  Dr. Vallone testified that the wounds from

16  gunshot #6 "would be consistent with" the "arm being extended toward the gun" that

17  was fired.[19]  Id. at 11-12.  He explained that "if you have an entry in the front of the

18  elbow . . . and the exit is [] behind it higher on the arm, that would be consistent with the

19  entrance being faced forward and . . . exit in the back."  Id. at 12.  He notes that "[t]he

20  only mitigating factor is that the [] front of the arm is mobile [so] the hinge of the elbow

21  can move th[e] front wound a little higher, but I wouldn't say very much."  Id.  In

22  response to plaintiffs' counsel's questioning, Dr. Vallone testified that the wounds from

23  gunshot #6 are not consistent with a scenario where the "shooter is above a person that's

24  seated and the person has his arm [pointed] downward."  Id.  At trial, plaintiffs' counsel

26  [19] The government objected to this testimony as calling for speculation and lacking

27  foundation as to the gun.  Id. at 11.  The Court now overrules the objection because,

    while Dr. Vallone's testimony on this subject has limited probative value, it is still

28  relevant to some degree.

argued that the trajectory of gunshot wound #6 supported a finding that Vahram's arms were raised and/or extended towards Operator 1 at the time of the shooting.

100.    Gunshot wound #7 entered the right temporal/parietal region of the scalp and did not have an exit wound. Id. at 13. The bullet passed through the right temporalis muscle, indented the skull, but did not enter the brain. Id. The bullet trajectory was right to left. Id.

101.    Gunshot wound #8 struck the right neck and did not have an exit wound. Id. The bullet trajectory was right to left. Id.

102.    Gunshot wound #9 struck the left index finger. Id. at 14. The bullet trajectory was indeterminate. Id. at 20.

103.    The autopsy report also found that Vahram had colon cancer which contributed, but was not related to, his immediate cause of death. Id. at 16. Dr. Vallone testified that his supervising physician at the time, Dr. James Robe, "thought it was important to include this as a significant finding." Id. Dr. Vallone testified that he did not think the colon cancer contributed to Vahram's death. Id.

104.    The Court finds that, because Dr. Vallone is not a ballistics expert, it is unable to draw conclusions on the occupant's movements based solely on the autopsy results and Dr. Vallone's testimony.

### ii.        Post-shooting Investigation and Interviews

105.    After the shooting, Agent Burke was asked to respond to the location because there was an agent-involved shooting. Sept. 21 Tr. at 26.

106.    At trial, plaintiffs attempted to introduce evidence of text messages from Kirakos' cell phone. These text messages purportedly showed that Kirakos had exchanged text messages with a contact named "House Guard" about a guard leaving the residence around 4:00 a.m. The government also attempted to introduce other contents of Kirakos' cell phone, including a video of a second phone displaying surveillance video from the front of the house. Plaintiffs objected on multiple grounds to the introduction of the contents of the cell phone, including for lack of relevance, Rule 403,

and improper disclosure.  Given that the contents of Kirakos' cell phone were not known to the operators at the time of the warrant operation, the Court sustains plaintiffs' objections and excludes the contents of the cell phone as irrelevant.

107.   Two or three days after the shooting, Burke reviewed the surveillance video from the home at the FBI Los Angeles office.  Id. at 54-55.  Burke testified that, as a general matter, the surveillance camera would have been removed by technical agents who would then download the video, put it into evidence, and then make it available for agents to review.  Id. at 55.  He watched about an hour of footage from the video prior to the bear cat vehicle coming down the street in front of the house.  Id. at 54.  According to Burke, the video only showed the bear cat vehicle coming down the street.  Id.  The video did not show any part of the shooting.  Id.

108.   A few days after the operation, Operators 1, 2, and 3 all independently spoke with FBI investigators about the shooting.  Sept. 19 Tr. at 72, 93; Sept. 21 Tr. at 51.  Both Operators 1 and 3 were represented by counsel.  Sept. 19 Tr. at 72, 93.  Operator 2 was not represented by counsel.  Sept. 21 Tr. at 51.  Based on the questioning, the investigators prepared and provided statements for Operators 1, 2, and 3 to respectively review.  Id. at 72, 93-94.  After making some changes, Operators 1, 2, and 3 all signed their respective statements.[20]  Id. at 72, 94; Sept. 21 Tr. at 52-53.

109.   The operators did not speak to each other or view the FLIR video prior to speaking with the FBI investigators.  Sept. 21 Tr. at 111. Operator 3 does not recall making any major changes, only changes to phrasing.  Sept. 19 Tr. at 94.

110.   At some point after the shooting, Operator 3 reviewed a single surveillance video from the front porch of the home.  Id. at 92.  Operator 3 recalls the video showing

---

[20] At trial, the Court admitted Operator 1's statement subject to a motion to strike at the conclusion of the case.  Plaintiffs lodged a hearsay objection.  Sept. 19 Tr. at 73; Sept. 21 Tr. at 112.  The Court finds that Operator 1's statement should be excluded as hearsay that does not fall within any exception.

30

SWAT team members approaching the front door, the suspect coming out with his hands up, and the suspect's family coming out of the home as well.  Id.

111.   After the FBI concluded its investigation, Operator 1 was not disciplined for his actions during the shooting.  Id. at 74.

## H. Specific Finding Regarding Whether Vahram Attempted to Draw a Weapon

112.   It appears that the tension in this case is between, on the one hand, Operator 1's testimony that he observed Vahram attempting to draw a waistband-holstered weapon, and, on the other hand, the fact that Operator 3 attempted to go hands on with the occupant and was surprised when the shots were fired.  Operator 3 specifically testified that he would not have gone hands on if he had known the occupant was reaching for a gun.

113.   At the hearing, plaintiffs argued that, to the extent Operator 1's testimony conflicts with Operator 3's, the Court should credit Operator 3's testimony as more accurate.  They contend that Operator 3 had a better vantage point to observe the occupant's movements.  While Operator 1 is taller than Operator 3, Operator 1's view into the truck was obstructed by the dashboard and steering wheel.  By contrast, Operator 3 was looking into the truck through the driver-side window after the tinted glass had been broken.  Thus, plaintiffs highlighted Operator 3's testimony that, after the window breach, he did not observe a gun/holster or see Vahram pulling on his shirt. They additionally emphasize that neither Operator 2 nor 3 had his weapon drawn immediately prior to the shooting.

114.   In response, the government argued that Operator 3 did not have a clear vantage point into the vehicle at the time of the shooting.   Specifically, it contends that the FLIR video shows Operator 3 stepping away from the vehicle during the window breach and then stepping back towards the window less than a second before Operator 1 fired.  Thus, the government claims that Operator 3 did not have time to get an accurate sense of the occupant's movements immediately prior to the shooting.

115.   The Court finds that Vahram was in-fact attempting to draw his gun immediately prior to the shooting.  Operator 1 was positioned at the front of the truck and was looking directly through the front windshield at Vahram.  Although his view was somewhat obscured by the steering wheel and dashboard, from his vantage point, he could see down to the top of the occupant's stomach.  His only responsibility by the time the team reached the truck was to watch Vahram and provide cover for Operators 2 and 3.  By contrast, Operator 3 was positioned outside the driver-side window of the truck, alongside Vahram.  He testified that his view of the occupant's hands was impacted by factors like his angle and his height, and that he never had a clear view of the occupant until the occupant was later removed from the truck.  Additionally, Operator 3 was only able to get a brief glimpse into the truck before Operator 1 fired.  The FLIR video appears to show that, after the window breach, Operator 3 returned to the truck window at nearly the exact same time that Operator 1 began firing.   Moreover, Operator 3's view was still limited after the window breach.  While he did testify that he did not see the occupant tugging at his shirt or waistband, he also testified that, from his vantage point, he would not have been able to see if the occupant had lifted his shirt up unless the occupant had raised the shirt all the way to his chin.  He also could not see the occupant's hands.  Together, these facts suggest that Operator 1 had a better vantage point to observe Vahram's movements relative to Operator 3.  When combined with the fact that a gun was later recovered from the floor of the truck after the shooting, along with an empty holster at Vahram's waistband, the Court is persuaded that Vahram was attempting to draw a gun immediately prior to the shooting.

## III.    CONCLUSIONS OF LAW

### A. Legal Standards

#### i.        Liability under the FTCA

116.   The FTCA provides that the United States may be held liable for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under

circumstances where the United States, if a private person, would be held liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).  In actions brought under the FTCA, the Government is "entitled to assert any defense based upon judicial or legislative immunity which otherwise would have been available to the employee of the United States whose act or omission gave rise to the claim, as well as any other defenses to which the United States is entitled."  28 U.S.C. § 2674.

117.   The FTCA contains a discretionary function exception to the United States' waiver of sovereign immunity, according to which there is no waiver of immunity for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function."  28 U.S.C. § 2680(a).  This exception applies "whether or not the discretion involved be abused."  Id.  "If the discretionary function exception applies to the challenged government conduct, the United States retains its sovereign immunity, and the district court lacks subject matter jurisdiction over that claim."  See Est. of Salazar v. United States, No. CV-1110279-JAK-SPX, 2014 WL 12588477, at *15 (C.D. Cal. May 20, 2014) (citing GATX/Airlog Co. v. United States, 286 F.3d 1168, 1173 (9th Cir. 2002)).  Courts determine whether conduct constitutes discretionary function pursuant to the two-part Gaubert test: (1) whether the challenged conduct involves an "element of judgment or choice" and (2) whether the "judgment is of the kind that the discretionary function exception was designed to shield."  United States v. Gaubert, 499 U.S. 315, 322-23 (1991).  "The primary focus of the second part of the test is on 'the nature of the actions taken and on whether they are susceptible to policy analysis,'" Fang v. United States, 140 F.3d 1238 (9th Cir. 1998), and "involve a 'decision grounded in social, economic, and political policy.'"  O'Toole v. United States, 295 F.3d 1029, 20134 (9th Cir. 2002).

### ii.    Burden of Proof

118.   In order to prevail on any of their claims, plaintiffs bear the burden of proof to establish the elements of each tort they allege by a preponderance of the evidence.

Cal. Evid. Code § 500; <u>Finley v. United States</u>, No. 07–cv–01939–DLJ EFB, 98–cr–00460–DLJ.2008 WL 2561594, at *7 (E.D. Cal. June 26, 2008).  However, "the [G]overnment bears the ultimate burden of proving" any affirmative defense.  <u>ITSI T.V. Productions, Inc. v. Agricultural Associations</u>, 3 F.3d 1289, 1291 (9th Cir.1993); Cal. Evid. Code § 500.

### B. Application

119.   Plaintiffs bring five claims against the United States, all pursuant to the FTCA, for (1) assault and battery; (2) wrongful death; (3) negligence; (4) violation of California Civil Code Section 52.1; and (5) negligent infliction of emotional distress.  As a threshold matter, the Court finds that plaintiffs' first, third, and fourth claims collapse into plaintiffs' second claim for wrongful death for the reasons set forth below.  The Court then proceeds to analyze plaintiffs' remaining claims for negligent infliction of emotional distress and wrongful death before finding that plaintiffs have failed to meet their burden of proof regarding each of these claims.

### i.    FTCA Claims for Assault and Battery, Negligence, and Violations of California Civil Code § 52.1

#### 1.   *Survival Actions Versus Wrongful Death Actions*

120.   Under California law, a decedent's survivors may bring a survival action pursuant to Cal. Civ. Proc. Code §§ 377.20 and 377.30 or a wrongful death action pursuant to Cal. Civ. Proc. Code § 377.60.  <u>Sprowl v. City of Barstow</u>, No. CV-18-1720-JGB-KKX, 2019 WL 8 106291, at *3 (C.D. Cal. Oct. 18, 2019).  "If a person dies having a cause of action for injuries suffered during life, the claim 'survives' to decedent's estate for the purpose of recovering damages that would have been awardable personally to decedent had he or she lived."  <u>Goodwin v. California Dep't of Corr. & Rehab.</u>, 2010 WL 11484527, at *3 (N.D. Cal. Nov. 12, 2010) (citing Cal. Civ. Proc. Code §§ 377.20-377.30; Ross, Cal. Practice Guide, Probate ¶ 15:280-81).  Survival claims may be brought by the personal representative of the decedent's estate or the decedent's successor-in-interest.  <u>Id.</u> at *4.

121.   "Section 377.34 [of the California Code of Civil Procedure] limits damages in survival actions to the victim's pre-death economic losses." <u>Chaudhry v. City of Los Angeles</u>, 751 F.3d 1096, 1104 (9th Cir. 2014) (citing <u>People v. Runyan</u>, 54 Cal. 4th 849, 862 (2012)).  More specifically, the "damages recoverable [in a survival action] are limited to the loss or damage that the decedent *sustained or incurred before death*, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and do not include damages for pain, suffering, or disfigurement." 6 Cal. Code Civ. P. § 377.34 (emphasis added). Accordingly, "[i]n cases where the victim dies quickly there will often be no damage remedy at all under § 377.34." <u>Chaudhry</u>, 751 F.3d at 1104.

122.   This is, in part, because "surviving relatives of the decedent may [also] bring a *wrongful death* action [pursuant to Cal. Code. Civ. P. § 377.60] seeking 'to recover pecuniary losses cause[d] by the death, including pecuniary support the decedent would have provided them, and noneconomic damages for being deprived of the decedent's society and comfort.'" <u>Sposato v. Elec. Data Sys., Corp.</u>, 188 F.3d 1146, 1149 (9th Cir. 1999) (citing Cal. Code Civ. P. § 377.60; <u>Garcia v. Superior Court</u>, 42 Cal.App.4th 177, 186-87 (Cal. Ct. App. 1996)) (emphasis added).  Together, these statutory provisions [Sections 377.34 and 377.60] preclude double recovery for the survivors of a decedent in cases where the decedent's injury is both the foundation of the decedent's cause of action in tort and the cause of the decedent's death, and also preclude recovery of noneconomic damages [e.g., pain and suffering] deemed to be personal to the decedent." <u>Id.</u> (citations omitted).

123.   Here, the Court has already ruled that Anait may not recover damages on behalf of Vahram as a successor-in-interest.[21]  At trial, plaintiffs did not introduce any

---

[21] <u>See</u> Dkt. 111 (finding that "the only damages Anait can pursue as successor-in-interest are any potential economic losses sustained by Vahram specifically between his injury and death, a timeframe of a few hours.  Anait has not provided any computation or evidence for such economic loss, and so she cannot accordingly recover on that basis");

*(footnote cont'd on next page)*

evidence regarding any potential economic losses that Vahram sustained in the hours between his injury and death.[22]  Accordingly, plaintiffs may not bring any survival claims and are limited to pursuing claims for wrongful death.

### 2.    Assault and Battery Claim

124.    Plaintiffs' first claim is a "state law survivorship action" for assault and battery brought pursuant to California Civil Procedure Code § 377.30 and the FTCA. SAC ¶¶ 64-71.  Plaintiffs allege that the operators unlawfully placed Vahram in reasonable fear of receiving an imminent violent injury by threatening to touch and shoot him, willfully and unlawfully using deadly force upon him, and otherwise using non-consensual and unlawful force and violence on him.  SAC ¶¶ 48, 50, 53.  Although plaintiffs pled this claim as a "survivorship action," they appear to seek wrongful death damages.  See SAC ¶ 54 (pleading that plaintiffs have suffered "loss of earnings and earnings capacity of [Vahram]," sustained damages from "loss of love, affection, society, service, comfort, support, right of support, expectations of future support and counseling, companionship, solace and mental support," and incurred "funeral and burial expenses.").

125.    Plaintiffs' claim fails as a survival claim for the reasons explained above. See supra Part III.A.  To the extent plaintiffs are seeking to recover damages for Vahram's wrongful death, this claim collapses into plaintiffs' second claim for wrongful

---

see also King v. United States, 2016 WL 146424, at *7 (C.D. Cal., Jan. 11, 2016) (dismissing plaintiff's survival claims because plaintiff did not allege that the decedent suffered economic damages during the four hours between the defendant's actions and the decedent's death); Cooper v. TriWest Healthcare Alliance Corp., No. 11-CV-2965-L RBB, 2013 WL 5883784, at *9 (S.D. Cal., Oct. 30, 2013) (dismissing claims based on survivorship where plaintiffs failed to plead recoverable pecuniary damages in accordance with Cal. Civ. Proc. Code § 377.34).

[22] While plaintiffs allege that Vahram "survived for a period of time and, therefore, suffered extreme physical and mental pain prior to his [] death,"  SAC ¶ 80, damages in survival actions are limited to the victim's pre-death economic losses and "do not include damages for pain [or] suffering."  6 Cal. Code Civ. P. § 377.34.

death based on Section 377.60.  See Cal. Code Civ. P.  377.60 (providing that wrongful death claims do not belong to the decedent, but rather to the persons specified in Section 377.60(a)).

### 3.    *Negligence Claim*

126.    Plaintiffs' third claim is a "state law survivorship action" for negligence brought pursuant to California Civil Procedure Code § 377.30 and the FTCA.  SAC at 22.  While plaintiffs have pled their negligence claim as a survival claim, it appears that they have pled wrongful death damages.  See SAC ¶¶ 71-72 (claiming that plaintiffs have "sustained damages resulting from the loss of love, affection, society, service, comfort, support, right of support, expectations of future support and counseling, companionship, solace and mental support, as well as other benefits and assistance, of the [d]ecedent, all to their general damages" and that plaintiffs will be "further deprived of the financial support and assistance of [d]ecedent [Vahram], and ha[ve] incurred funeral and burial expenses").

127.    Plaintiffs are barred from pursuing their negligence claim as a survival claim for the reasons explained above.  See supra Part III.A.  To the extent plaintiffs are seeking wrongful death damages, this claim also collapses into plaintiffs' second claim for wrongful death based on Section 377.60.

### 4.    *Bane Act Claim*

128.    Plaintiffs fourth claim is brought pursuant to the FTCA for violation of California Civil Code § 52.1 (the "Bane Act").  The Bane Act provides that injured individuals may sue persons who "interfere[] by threat, intimidation, or coercion . . .  with the exercise or enjoyment . . . of [the individuals'] rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of [California]."  Id § 52.1(a)-(b).  Here, plaintiffs allege that the operators violated the Bane Act by "interfere[ing] by threats, intimidation and/or coercion, with [Vahram's] exercise and enjoyment of his rights secured by the Constitutions of the United States and the State of California, including interference with his right to be

secure in his person and free from the use of excessive force and the right of protection from bodily restraint and harm."  SAC ¶ 75.

129.   Defendant argues that "Bane Act claims may not be asserted by wrongful death plaintiffs."  Dkt. 119 at 15 (citing <u>Bay Area Rapid Transit Dist. v. Superior Court</u>, 38 Cal. App. 4th 141, 144 (1995)).  Moreover, it contends that this Court lacks jurisdiction to hear plaintiffs' Bain Act claim because the United States has not waived sovereign immunity for Bane Act claims based on alleged excessive force in violation of the United States or California Constitutions.  <u>See</u> Dkt. 119 at 14 (citing <u>Blanchard v. County of Los Angeles</u>, No. 8:19-cv-02438-JVS-DFM, 2022 WL 17081308, at *3-*4 (C.D. Cal. Aug. 25, 2022)).

130.   In their trial brief, plaintiffs argue that their Bane Act claim is cognizable under the FTCA because it is premised on a violation of the California Constitution as opposed to the federal Constitution.  Dkt. 112 at 8.  They do not address whether a Bane Act claim may be asserted by wrongful death plaintiffs.

131.   California courts have made clear that "[t]he Bane Act is not a wrongful death provision."  <u>Bay Area Rapid Transit Dist.</u>, 38 Cal. App. 4th at 142.  Thus, plaintiffs may only bring a Bane Act claim as a survival claim.  <u>Est. of Chivrell v. City of Arcata</u>, 694 F. Supp. 3d 1218, 1229 (N.D. Cal. 2023) (finding that "even though the Bane Act is not a wrongful death provision, a decedent's successor-in-interest has standing to assert a Bane Act claim on the decedent's behalf").  However, in this case, plaintiffs are barred from pursuing survival claims on Vahram's behalf for the reasons set forth above.  <u>See supra</u> Part III.A.  Accordingly, the Court finds that plaintiffs' Bane Act claim fails as a matter of law.[23]

---

[23] Because the Court finds that plaintiffs may not pursue their Bane Act claim as wrongful death plaintiffs, it does not address whether defendant has waived sovereign immunity for such a claim.

### ii.    FTCA Claim for Negligent Infliction of Emotional Distress

132.    Plaintiff Kirakos also brings a claim for negligent infliction of emotional distress.

133.    "In the absence of physical injury or impact to the plaintiff himself, damages for emotional distress should be recoverable only if the plaintiff: (1) is closely related to the injury victim, (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim and, (3) as a result suffers emotional distress beyond that which would be anticipated in a disinterested witness." Thing v. La Chusa, 48 Cal.3d 644, 647 (1989).

134.    It is undisputed that Kirakos, as the son of Vahram, was closely related to the victim.  However, defendant contends that Kirakos cannot pursue a negligent infliction of emotional distress claim because he has testified that he did not witness the shooting and only saw Vahram after he was shot.  The Court agrees.  At the time of the shooting, Kirakos was inside the residence and was neither present nor aware that his father was being shot.  Consequently, Kirakos' emotional distress did not result from observing the shooting.  While he may have suffered emotional distress due to his father's death, this form of distress is not recoverable under a claim for negligent infliction of emotional distress.  Accordingly, the Court finds that plaintiffs' claim for negligent infliction of emotional distress fails.

### iii.    FTCA Claim for Wrongful Death

135.    At bottom, plaintiffs' primary claim is that the operators deliberately and/or negligently used excessive force against Vahram and caused his wrongful death.  See SAC ¶ 56.  A plaintiff establishes a claim for wrongful death by demonstrating a "tort, i.e., negligence or other wrongful act, the resulting death, and the damages, consisting of the pecuniary loss suffered by the heirs." Quiroz v. Seventh Ave. Center, 140 Cal.App.4th 1256, 1263 (Cal.Ct.App.2006); see also Cal.Code Civ. Pro. 377.60 et seq.

136.    Here, plaintiffs' wrongful death claim is premised on the tort of either battery or negligence.  However, regardless of which tort provides the premise for

plaintiffs' wrongful death claim, the focus of the Court's inquiry is the same: whether the law enforcement officers acted reasonably when using deadly force.[24]

137.    The "reasonableness of a peace officer's conduct must be determined in light of the totality of circumstances," from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Hayes, 57 Cal. 4th at 632. The totality of circumstances includes "pre-shooting" conduct, which itself involves the "tactical conduct and decisions employed by law enforcement preceding the use of deadly force."[25] Id. at 626.  In some cases, "preshooting circumstances might show that an otherwise reasonable use of deadly force was in fact unreasonable." Id. at 630. "[W]here a plaintiff does not allege a separate injury from the pre-shooting conduct of law enforcement personnel, 'the preshooting conduct is only relevant . . . to the extent it

---

[24] To demonstrate battery by a peace officer based on the use of deadly force, plaintiff must prove that (1) the defendant intentionally touched the decedent; (2) the defendant used deadly force on the decedent; (3) the defendant's use of deadly force was not necessary to defend human life; (4) that the decedent was killed; and (5) that defendant's use of deadly force was a substantial factor in causing decedent's death.  See CACI 1305B (Battery by Peace Officer (Deadly Force)).  To demonstrate that a peace officer negligently used deadly force, plaintiff must show that (1) the defendant was a peace officer; (2) the defendant used deadly force on the decedent; (3) that defendant's use of deadly force was not necessary to defend human life; (4) that the decedent was killed; (5) and that defendant's use of deadly force was a substantial factor in causing decedent's death.  See CACI 441 (Negligent Use of Deadly Force by Peace Officer).

The third element of both claims is identical.  Both sets of CACI instructions further instruct that "use of deadly force was necessary to defend human life only if a *reasonable* officer in the same situation would have believed . . . that deadly force was necessary [] to defend against an imminent threat of death or seriously bodily injury to [defendant and/or another person]." CACI 1305B, 441 (emphasis added).  Indeed, California courts have "long recognized that peace officers have a duty to act reasonably when using deadly force." Hayes, 57 Cal. 4th at 629.

[25] As the Court previously concluded, "pursuant to the FTCA's discretionary function exception, discretionary [pre-shooting] conduct itself cannot serve as the basis for establishing liability, but relevant discretionary conduct can be considered as part of the totality of the circumstances inquiry as to whether use of deadly force was reasonable." Dkt. 89 at 12 (citing Est. of Salazar, 2014 WL 12588477 at *23).

shows, as part of the totality of circumstances, that the shooting itself was negligent.'" Est. of Salazar, 2014 WL 12588477 at *15 (quoting Hayes, 57 Cal. 4th at 690).  "[T]he reasonableness of the officers' preshooting conduct should not be considered in isolation.  Rather, it should be considered in relation to the question [of] whether the officers' ultimate use of deadly force was reasonable."  Hayes, 57 Cal. 4th at 691. Ultimately, "all determinations of unreasonable force, must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  Hayes v. Cnty. of San Diego, 736 F.3d 1223, 1232–33 (9th Cir. 2013) (internal quotation omitted).

138.    At the hearing, plaintiffs argued that (1) the evidence shows that Vahram was not reaching for his waistband to draw a weapon immediately prior to the shooting; and (2) even if Vahram *was* reaching for a weapon, given the circumstances, it was unreasonable for Operator 1 to fire prior to seeing the weapon in Vahram's hand.

139.    The Court has already addressed plaintiffs' first argument in its findings of fact above and concluded that Vahram was, in-fact, attempting to draw a weapon immediately prior to the shooting.  See infra Part II.H.  Regarding plaintiffs' second argument, the Court finds that, under the totality of the circumstances, the law enforcement officers here acted reasonably in using deadly force for the following reasons.

140.    First, the operators were executing a high-risk search and arrest warrant operation.  Operator 3 testified that the FBI uses SWAT for warrant operations that investigative squads believe may be high risk.  In this case, the operators were briefed on the morning of the operation and informed that the target of the warrant operation, Kirakos Kesablyan, had been under investigation for several years as "a close associate of numerous high level Armenian organized crime members" and was "a person of interest in two homicides, one as recently as October 2017."  Defendant's Exh. 78 at 1. They were aware that Kesablyan had "an extensive criminal history [] includ[ing]

41

1  burglary, grand theft forgery, assault with a deadly weapon, kidnapping,

2  transportation/sale of narcotics, and dissuading a victim or witness with threats." Id.

3  While Operator 1 testified that Kirakos' criminal history did not affect the SWAT team's

4  approach to this particular warrant operation, he further testified that this was because

5  most subjects of SWAT team warrant operations have similar types of criminal history.

6  Accordingly, it appears clear that the SWAT operators believed this operation posed as

7  much of a high-level of risk as the many other search and arrest warrant operations they

8  had previously executed.

9      141.   Second, the operators believed that Vahram was associated with the target

10  residence and had arrived to patrol/guard the target residence, making him potentially

11  dangerous.  For the duration of the warrant operation, Operators 1, 2, and 3 did not know

12  Vahram's identity.  Accordingly, while the operators were aware that the vehicle's

13  occupant was not the target of the search warrant soon after arriving at the truck, they did

14  not know whether the occupant had a criminal history, a gun, or a history of past

15  violence.  However, all three operators knew that Vahram had been observed arriving

16  sometime between 5:00-6:00 a.m. and had begun walking around the property.  Vahram

17  walked around the yard to the left of the property and the driveway on the right-hand

18  side of the property before re-entering his truck.  He later exited the truck again and

19  walked down the street, before re-entering his truck.  Based on these observations, all

20  three operators believed that Vahram was likely associated with the target residence and

21  was attempting to guard or secure the residence.

22      142.   Third, Vahram attempted to draw his waistband-holstered handgun

23  immediately before Operator 1 fired.  Operator 1 observed Vahram engage in a sequence

24  of movements distinctly associated with drawing a waistband-holstered weapon.

25  Specifically, he saw Vahram's left arm move upward to pull on his clothing, his clothing

26  crinkle up, his right shoulder move up, his right arm move down toward his waistband,

27  and finally his right arm pull back up again as if he had cleared a firearm from a

28  waistband holster.  Based on Operator 1's personal experience carrying a weapon in the

1    waistband and the hundreds of times he had observed others drawing weapons from the

2    waistband, he believed that Vahram had just drawn a waistband-holstered weapon and

3    was raising it towards the operators.  Operator 2 noted that, after a handgun is out of the

4    holster, it typically takes less than a second to raise it and point it at someone.  Operator

5    1 believed that if he waited any longer to fire, he or his teammates would have been shot

6    by the occupant.  Operator 1's testimony is bolstered by the subsequent discovery of a

7    handgun in the vehicle, suggesting that Vahram had in fact been attempting to draw a

8    waistband-holstered weapon.  See Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994)

9    ("The judge must carefully examine all the evidence in the record, such as . . . the

10    available physical evidence, . . . to determine whether the officer's story is internally

11    consistent and consistent with other known facts.").

12        143.    Fourth, the operators were in close proximity to Vahram when he moved to

13    draw his gun.  Thus, Operator 1 "had little time to take other, non-deadly actions."  Est.

14    of Salazar, 2014 WL 12588477 (finding that close proximity between law enforcement

15    officers and a suspect holding a gun weighed in favor of the reasonableness of using

16    deadly force).

17        144.    Fifth, Vahram reached for his waistband even after the operators had

18    identified themselves as FBI agents.  Upon arriving at the truck, Operator 3 initiated a

19    standard knock and announce to inform the occupant that the operators were with law

20    enforcement and not members of a rival criminal gang.  Specifically, Operator 3 knocked

21    on the window, yelled "FBI" at least once, and commanded the occupant to put his hands

22    up.

23        145.    Finally, the evidence suggests Operator 1 had mere seconds to determine

24    whether Vahram posed a threat.  Operator 1 testified that the occupant began tugging on

25    his shirt after the window was smashed, and the FLIR video shows that approximately 3-

26    4 seconds elapsed between the window breach and shots being fired.  Plaintiffs' Exh. 73;

27    see Hayes v. Cnty. of San Diego, 736 F.3d 1223, 1232–33 (9th Cir. 2013) ("[A]ll

28    determinations of unreasonable force, must embody allowance for the fact that police

43

officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.")  (internal quotation omitted).

146.    A key aspect of this case is the fact that Operator 1 did not see a weapon in the occupant's hands prior to shooting.  Rather, Operator 1 saw the occupant reach for his waistband in a sequence of movements distinctly associated with drawing a waistband-holstered weapon.

147.    In situations where officers see a suspect clearly holding a weapon, the Ninth Circuit has observed that officers are not "require[d] [] to delay their fire until a suspect turns his weapon on them."  George v. Morris, 736 F.3d 829, 838 (9th Cir. 2013) (officers saw the suspect holding a pistol in his left hand).  Rather, "[i]f [a] person is armed–or reasonably suspected of being armed–a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat" justifying the use of deadly force.  Id.  Thus, if Operator 1 had seen Vahram reach towards his waistband and *specifically saw a pistol in Vahram's hand*, deadly force would have clearly been justified.[26]

148.    Here, Operator 1 did not see a weapon in Vahram's hand.  However, in some situations, deadly force may be reasonable even when a suspect is not observed holding a weapon.  In George, the Ninth Circuit noted that "a furtive movement [or] harrowing gesture . . . might create an immediate threat" if a person is "reasonably suspected of being armed."  Id.  Additionally, in Perez v. County of Sacramento, the court found that an officer's use of force was objectively reasonable after he saw the suspect "reach toward his left waistband, where [he] believed a firearm [was] located after seeing the butt or pistol grip of [a] gun sticking out of [the suspect's] waistband moments earlier."  No. CV-00356-TLN-JDP, 2023 WL 5021310, at *4 (E.D. Cal. Aug.

---

[26] At the hearing, plaintiffs' counsel appeared to concede that it would have been reasonable for Operator 1 to shoot if he had seen a pistol in Vahram's hand.

7, 2023).  The gun was ultimately found to be an imitation firearm.  Id. at *1.  Thus, the focus is whether the officers reasonably suspect that a person is armed and/or dangerous.

149.    The Ninth Circuit's reasoning in Cruz v. City of Anaheim is illustrative. 765 F.3d 1076 (9th Cir. 2014).  There, a confidential informant told police about Cruz's location and informed them that Cruz was a gang member who would be carrying a gun. Id. at 1077-78.  Police officers subsequently executed a traffic stop on Cruz's vehicle. Id. at 1078.  Cruz opened his door, and police ordered him to get on the ground.  Id. Cruz ignored these commands and instead reached for the waistband of his pants, at which point officers opened fire.  Id.  No weapon was found on Cruz's body, although a gun was later recovered from the passenger seat of the car.  Id.  The Ninth Circuit noted that, when the police confront a person who has exhibited "dangerous and erratic behavior," "[i]t would be unquestionably reasonable for police to shoot a suspect. . . if he reaches for a gun in his waistband, *or even if he reaches there for some other reason*." Id. (emphasis added).  Thus, the court held that, "[t]o decide [a] case [under these circumstances,] a jury would have to answer just one simple question: [d]id the police see Cruz reach for his waistband?  If they did, they were entitled to shoot; if they didn't, they weren't."  Id. at 1079.  The court ultimately found that this was a question of fact for the jury and denied summary judgment.  Id. at 1080.

150.    Here, the operators reasonably suspected that Vahram may have been armed.  Operator 1 was participating in a high-risk SWAT operation to arrest a man who was suspected to have close associations to Armenian organized crime, was a person-of-interest in two homicides, and had an extensive criminal history including assault with a deadly weapon.  Operator 1 was specifically assigned to detain an unknown individual who had unexpectedly arrived at the target property in a truck shortly after 5:00 AM and appeared to be patrolling/guarding the target residence.  Under these circumstances, the operators reasonably inferred that the occupant of the truck was associated with the target residence and may have been armed.  See Sept. 21 Tr. at 35 (Operator 3 testified

in response to questions on cross examination that, while approaching the window after the breach, he "was concerned it was possible" that the driver had a gun).

151.    Immediately prior to the shooting, Operator 1 was positioned at the front driver side of the truck with a clear view through the front windshield to provide cover for his fellow operators.  From his vantage point, he saw the occupant's left arm move up to begin pulling on his clothing while his right arm moved up and down as if trying to gain access to his waistband in a sequence of movements distinctly associated with drawing a waistband-holstered weapon.  The Court "does not interpret [the Ninth Circuit's precedent] as holding that *any* suspect who reaches toward their waistband or has a concealed hand, no matter the circumstances, has justified the use of deadly force." Garcia v. Cnty. of Napa, No. 21-CV-03519-HSG, 2023 WL 355148, at *7 (N.D. Cal. Jan. 17, 2023) (emphasis added).  But here, a reasonable officer in Operator 1's position would have seen Vahram's attempt to draw a waistband-holstered weapon, combined with a reasonable belief that Vahram may have been armed, as the type of "furtive movement" that created an immediate threat justifying the use of deadly force.  See George, 736 F.3d at 838.  Accordingly, the Court finds that plaintiffs have failed to meet their burden of proof as to their wrongful death claim.

## IV.    CONCLUSION

In accordance with the foregoing, the Court orders as follows:

1.    Judgment in favor of defendant is appropriate.

Defendant shall submit a proposed form of judgment in accordance with the foregoing and with the procedures set forth in the Local Rules of Court.

IT IS SO ORDERED.

Dated: August 19, 2024

_Christina A. Snyder_

CHRISTINA A. SNYDER
UNITED STATES DISTRICT JUDGE